FIRST CONGREGATIONAL CHURCH OF ROCKLAND *vs.* HOLYOKE MUTUAL FIRE INSURANCE COMPANY.

SAME *vs.* SPRINGFIELD FIRE AND MARINE INSURANCE COMPANY.

SAME *vs.* SUN FIRE OFFICE COMPANY.

SAME *vs.* QUINCY MUTUAL FIRE INSURANCE COMPANY.

SAME *vs.* FITCHBURG MUTUAL FIRE INSURANCE COMPANY.

SAME *vs.* NORTH BRITISH AND MERCANTILE INSURANCE COMPANY.

Suffolk.   January 16, 17, 1893. — March 17, 1893.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & BARKER, JJ.

*Insurance on Building — Increase of Risk — Meaning of "kept" on the Premises — Ordinary Repairs — Question for the Jury — Testimony of Experts — Discretion of Presiding Justice.*

A policy of insurance upon a church built of wood provided that the policy should be void if without the assent in writing or in print of the company "the situation or circumstances affecting the risk shall, by or with the knowledge, advice,

---

agency, or consent of the insured, be so altered as to cause an increase of such risk." While a naphtha torch was being used to burn off the old paint preparatory to repainting, the building caught fire and was entirely consumed. The question was whether a change of this kind, increasing the risk with the knowledge, agency, and consent of the insured was an alteration of "the situation or circumstances affecting the risk" within the meaning of the policy. *Held,* that as the change had existed continuously during the working hours of every day for nearly a month, and the work was not nearly done when it was interrupted by fire, the change of the condition was sufficiently long continued to be deemed a change in "the situation or circumstances affecting the risk."

The word "kept," as used in a policy of insurance which provides that it shall be void if certain oils and burning fluids shall be kept on the premises, implies a use of the premises as a place of deposit for the prohibited articles for a considerable period of time.

In the absence of an express stipulation to that effect, a contract of insurance should not be held to forbid the making of ordinary repairs in a reasonably safe way, and provisions to the effect that the policy shall be void if, without the assent in writing or in print of the company, naphtha or other oils or burning fluids shall be "used by the insured on the premises insured," should not be deemed to apply to an increase of risk or to a use of an article necessary for the preservation of the property. Hence, where paint was removed by the use of a naphtha torch from the outside of a building covered with soft pine sheathing tongued and grooved and put on horizontally, and the weather was hot and dry and the boards shrunken so that in some places there were cracks, and the building caught fire and was entirely consumed, the questions for the jury are, "Whether the company, if familiar with the condition of the building and the methods usually adopted in making repairs, should have contemplated when it issued the policy that the insured would burn off the paint at such a time and in such a way as it did? Was such a use of naphtha a reasonably safe and proper way of making repairs on the building under the circumstances?"

A policy of insurance contained a provision that it should be void if, without the assent in writing or in print of the company, naphtha should be used by the insured on the premises insured. While a naphtha torch was being used to burn off the old paint preparatory to repainting, the building caught fire and was consumed. *Held,* in an action on the policy, that, as bearing on the question whether the use of a naphtha torch would increase the risk, the company might show, if it could, by an expert in regard to the rates of premium for fire insurance, that the rates on a building whose paint was to be removed from the outside by the use of such a torch would be higher than if there was to be no such use; but that the expert could not be asked his opinion as an expert as to the actual effect of the use of naphtha in reference to danger from fire.

A policy of insurance contained a provision that it should be void if, without the assent in writing or in print of the company, naphtha should be used by the insured on the premises insured. While a naphtha torch was being used to burn off the old paint preparatory to repainting, the building, which was covered with soft pine sheathing, tongued and grooved and put on horizontally, caught fire and was consumed. *Held,* in an action on the policy, that the testimony of experts in regard to the proper and usual way of removing paint was rightly admitted. *Held, also,* that, as it is largely within the discretion of the judge to determine how far to go into the trial of collateral issues, he could exclude the question, "Whether or not the sheathing of the church caught fire at any time previous to the day the church was burned by the use of the torch?"

KNOWLTON, J. The policies of insurance sued on in these six cases are all alike in containing provisions which are relied on in defence, and which are as follows : " This policy shall be void if . . . without the assent in writing or in print of the company . . . the situation or circumstances affecting the risk shall, by or with the knowledge, advice, agency, or consent of the insured, be so altered as to cause an increase of such risk; or if camphene, benzine, naphtha, or other chemical oils or burning fluids shall be kept or used by the insured on the premises insured, except that what is known as refined petroleum, kerosene, or coal oil may be used for lighting," etc. The property insured was a church edifice, built of wood, not clapboarded, but sheathed horizontally with grooved and tongued sheathing, closely matched together, and painted and sanded on the outside. The paint had peeled and curled, and at the time of the fire the plaintiff was repainting the building. Three trustees had "the control and care of all the real estate belonging to the church," and were authorized to provide for its insurance and repairs. They arranged with one Gilson, a painter, to paint the outside of the building by the day, at the rate of $3 per day for himself, and $2.75 per day for his men, the trustees furnishing the paint stock, and he furnishing his own brushes, ladders, and other tools of trade. It was also arranged that he was to burn off the old paint with a torch, or some such implement, preparatory to repainting. He procured for the purpose a naphtha torch, so made as to hold a quart or more of naphtha, with a handle at one side of the receptacle, and a tube extending out on the opposite side through which a flame could be emitted, produced by the gas from the naphtha and compressed air. It could be made to send this flame out in a straight line about two feet, and when in use it made a noise " similar to a steam-engine." The flame could be regulated by a thumb-screw so as to extend not more than six or eight inches beyond the end of the tube, and the torch was used by holding it in the left hand and passing it along, so that the flame from the tube would blister or burn the paint, which could then easily be scraped off. The evidence tended to show that the trustees knew that Gilson was to burn off the paint, and left it to him to determine exactly in what way he would do it. One or more of them saw the torch which was used before he began to use it, and they repeatedly saw him using it before the fire.

When the work had been going on about four weeks, the torch, according to the testimony, having been used daily during all the working days, the building caught fire on the edge of a board where there was a crack and where the torch had just been used, and was entirely consumed. This was on the 16th day of July, 1890, and there was evidence that the weather was hot and that the boards were very dry. There was also evidence that, as a protection against fire, a pail of water was kept on hand while the work was going on. The evidence tended strongly to show that the danger of a conflagration was greatly increased by the use of the naphtha torch on the dry, inflammable, soft pine boards, with their shrunken joints.

If the risk was increased by the use of the torch, it seems, on the undisputed facts, that it was by the agency and with the knowledge and consent of the insured, for the officers represented the plaintiff in the management of the property, and saw the torch in use, and they authorized the use of it before the work was begun. *National Security Bank* v. *Cushman,* 121 Mass. 490. Gilson was their agent acting in the exercise of his discretion and with full authority in procuring and using the naphtha, and on the uncontradicted evidencethe use of naphtha by him was a use of it by the insured, within the meaning of the provision quoted from the policies. Was a change of this kind increasing the risk with the knowledge, agency, and consent of the insured, an alteration of " the situation or circumstances affecting the risk," within the meaning of those words in the policies ? Those words imply something of duration, and a casual change of a temporary character would not ordinarily render the policy void under this provision. But this change had existed continuously during the working hours of every day for nearly a month, and the work was not nearly done when it was interrupted by the fire. We are of opinion that the change of the condition was sufficiently long continued to be deemed a change in " the situation or circumstances affecting the risk." In the case of *Lyman* v. *State Ins. Co.* 14 Allen, 329, it was held that an alteration of a building which increased the risk for three weeks was enough to render the policy void under a similar clause.

We find no evidence that naphtha was kept on the premises. The word " kept," as used in the policy, implies a use of the premises as a place of deposit for the prohibited articles for a

considerable period of time. See *Williams* v. *New England Ins.
Co.* 31 Maine, 219 ; *O'Niel* v. *Buffalo Ins. Co.* 3 Comst. 122 ;
*Williams* v. *Fireman's Fund Ins. Co.* 54 N. Y. 569 ; *Mears* v.
*Humboldt Ins. Co.* 92 Penn. St. 15 ; *Putnam* v. *Commonwealth
Ins. Co.* 18 Blatchf. C. C. 368.

For nearly four weeks naphtha was used within a few inches
of the outer wall of the building to produce the flame which was
brought in contact with the building. It would be a narrow and
unreasonable construction of the policies in reference to the pur-
poses for which the words were inserted to say that the use of
naphtha was not " on the premises " because while in liquid
form it was a few inches outside of the wall, when it was made
to produce an effect directly on the premises by burning it in
the form of gas and directing it against the building.

On the undisputed facts as stated in the bill of exceptions, the
only ground on which the plaintiff could fairly ask to present a
question to the jury is upon its contention that the use of the
naphtha and the change in conditions affecting the risk occurred
through making ordinary repairs in a reasonable and proper
way, and that in the provisions quoted from the policies there
is an implied exception of what is done in making ordinary
repairs. It is generally held that such provisions are not in-
tended to prevent the making of necessary repairs, and the use
of such means as are reasonably required for that purpose.
*O'Niel* v. *Buffalo Ins. Co.* 3 Comst. 122. *Dobson* v. *Sotheby*,
Mood. & Malk. 90. *Franklin Ins. Co.* v. *Chicago Ice Co.* 36 Md.
102. *Billings* v. *Tolland County Ins. Co.* 20 Conn. 139. *Mears*
v. *Humboldt Ins. Co.* 92 Penn. St. 15. *Williams* v. *New England
Ins. Co.* 31 Maine, 219. *Putnam* v. *Commonwealth Ins. Co.* 18
Blatchf. C. C. 368. Both parties to a contract for insurance
must be presumed to expect that the property will be preserved
and kept in a proper condition by making repairs upon it.
Policies on buildings are often issued for a term of five years or
more. The making of ordinary repairs in a reasonable way may
sometimes increase the risk more or less while the work is going
on, or involve the use of an article whose use in a business car-
ried on in the building is prohibited by the policy. In the ab-
sence of an express stipulation to that effect, a contract of
insurance should not be held to forbid the making of ordinary
repairs in a reasonably safe way, and provisions like these we are

considering should not be deemed to apply to an increase of risk or to a use of an article necessary for the preservation of the property. We are therefore of opinion, that if the use of naphtha at the time and in the manner in which it was used was reasonable and proper in the repair of the building, having reference to the danger of fire as well as to other considerations, it would not render the policies void. But the questions submitted to the jury on the answers to which verdicts were ordered for the plaintiff did not sufficiently present the matters of fact in issue. The only question bearing on the most vital part of the issue was as follows : " Was the method used the method ordinarily pursued to remove the paint on the outside of a building preparatory to scraping it off to repaint it?" The order of verdicts for the plaintiff on an affirmative answer to this question assumed that the removal of the paint from this building was reasonably necessary to the repair of the building. It also assumed that this building, in reference to the danger from moving the flaming torch all over its external surface, was like ordinary buildings. Many buildings are built of brick, and painted on the outer walls. Many others are clapboarded in such a way as to make a very close, tight covering. If this is the method ordinarily pursued when paint is to be removed from the outside of a building, it does not follow that it is ordinarily pursued when the building is covered with soft pine sheathing, tongued and grooved and put on horizontally, and when, at the time of doing the work, the weather is very hot and dry, and the boards shrunken so that in some places there are cracks.

Gilson testified that, although he had been a house painter in Rockland twenty-five years, he had never burned off paint from the outside of a building before. The architect who was consulted by the plaintiff in regard to repairs advised removing the old paint by the application of a paint remover, which was a preparation to be applied by a brush or a sponge. The use of naphtha and the increase of risk by an alteration of the circumstances affecting it were permitted under the implied exception only when reasonably required for the making of repairs. If it was unreasonable to use naphtha under the circumstances, at the time and in the manner disclosed by the evidence, the use was not within the exception, and the policies became void. The question for the jury was whether the defendants, if familiar with the condition of the

building and the methods usually adopted in making repairs, should have contemplated when they issued the policies that the plaintiff corporation would burn off the paint at such a time and in such a way as it did.   Was such a use of naphtha a reasonably safe and proper way of making repairs on this building under the circumstances?   The questions submitted to the jury were not equivalent to these.

As bearing on the question whether the use of a naphtha torch would increase the risk, the defendants might show, if they could, by an expert in regard to the rates of premium for fire insurance, that the rates on a building whose paint was to be removed from the outside by the use of such a torch would be higher than if there was to be no such use.   The relative rates usual for insurance under different circumstances are treated as facts which a jury may consider in determining the degree of the risk.   *Webber* v. *Eastern Railroad,* 2 Met. 147.   *Luce* v. *Dorchester Ins. Co.* 105 Mass. 297, 301.   *Cornish* v. *Farm Buildings Ins. Co.* 74 N. Y. 295.   *Hartman* v. *Keystone Ins. Co.* 21 Penn. St. 466.   *Planters' Ins. Co.* v. *Rowland,* 66 Md. 273.   The other question to the witness, which called for his opinion as an expert as to the actual effect of the use of naphtha in reference to danger from fire, was incompetent.   *Lyman* v. *State Ins. Co.* 14 Allen, 329.

The testimony of experts in regard to the proper and usual way of removing paint was rightly admitted.

It was within the discretion of the court to exclude the question, "Whether or not the sheathing of the church caught fire at any time previous to the day the church was burned by the use of the torch?"   It might have caught fire in such a way as would have no tendency to show that the use of the torch was an unreasonable and improper method of making repairs.   On the other hand, the circumstances may have been such as to make it a proper fact for the consideration of the jury.   It is largely within the discretion of the court to determine how far to go into the trial of collateral issues.

*Verdicts set aside.*

*A. Hemenway,* for the defendants.
*W. A. Gaston & L. S. Dabney,* for the plaintiff.