CHARLES DOWD BOX CO., INC & another *vs.* FIREMAN'S FUND INSURANCE COMPANY & others.

Suffolk. March 9, 1966. — June 13, 1966.

Present: WILKINS, C.J., SPALDING, CUTTER, SPIEGEL, & REARDON, JJ.

*Insurance,* Fire insurance: increase of risk, construction work, sprinkler clause, amount of loss. *Building Laws. Evidence,* Evidence binding a party. *Interest. Agency,* What constitutes, Independent contractor.

Where a fire insurance policy provided that the insurer should "not be liable for loss occurring . . . while the hazard . . . [was] increased by any means within the control or knowledge of the insured," that since

the policy "rate" was "based on the protection of the premises by the sprinkler system, it . . . [was] a condition of this policy that . . . no unsprinklered additions . . . [should] be made to the building(s)," that "Permission [was] granted to make additions," that the policy should also cover such additions, that the clause permitting additions did not "waive or modify any of the conditions of the Automatic Sprinkler Clause," and that "Permission [was] granted for such use of the premises as . . . [was] usual or incidental to the occupancy as described in this policy," and where the policy covered buildings and contents of a company using combustible rolls of paper stored in an open area and constructing a metal addition to a building to house the rolls which was "substantially complete" but did not yet have a planned sprinkler system when loss by fire occurred, the insurer was not entitled, in an action against it on the policy by the company, to a directed verdict by reason of the presence of the rolls in the area, the use of welding equipment in the construction work, the continuation of business during construction, or the use of the addition prior to installation of the sprinkler system. [118–120]

A provision of a city ordinance that "An Automatic Sprinkler System shall be installed in . . . such portion of every building as is used for the storage, manufacture or sale of merchandise" did not require the installation of a sprinkler system in a new building before it was used for the storage of merchandise, but merely identified the type of building in which sprinklers must be installed. [120]

In an action on a fire insurance policy to recover a loss, a finding by the trial judge of the amount of damage to the insured's buildings and contents was warranted by the evidence, including testimony of several witnesses who saw the property of the insured before and after the fire and testified as to the value of various items; the insured was not bound by testimony of an accountant who supervised the keeping of the insured's books that the amount of damage to the buildings and contents was a sum substantially less than the amount found by the trial judge. [120–121, 123]

In an action on an insurance policy covering business interruption loss from fire, a finding by the judge for the plaintiff in a certain amount was warranted by evidence of decrease in the earnings of the insured and the making of expenditures by it to reduce loss over a substantial period following a fire at its plant. [123–125]

Under an insurance policy covering business interruption loss from fire, requiring payment by the insurer only for the "actual loss sustained" and providing that interest on the amount of the loss should be computed "from the time when the loss . . . [should] become payable," interest on the amount of business loss interruption incurred during a year following a fire should begin on a date at about the end of that year as of which the loss was calculated. [125–126]

In an action on a fire insurance policy, there was no error in the trial judge's denial of a request for a ruling by the insurer that "On all the evidence the Court is required to find that . . . [a named person] was retained by the . . . [insured] . . . to prepare and present its fire

loss claim" where evidence warranted findings that the insured's accountant had prepared the claim and that the named person was an independent consulting engineer hired by the insured to estimate the damage.   [126–127]

CONTRACT.   Writ in the Superior Court dated May 22, 1961.

The issue of liability on fire insurance policies was tried before *Good, J.*, and the issue of damages was heard by him without jury.

*John W. Burke* (*Joseph J. Hurley* with him) for Fireman's Fund Insurance Company & others; *Robert E. McCourt,* for Merchants and Business Men's Mutual Insurance Company, also with him.

*Sumner H. Babcock* (*Wilmot R. Hastings & Everett H. Parker* with him) for the plaintiffs.

SPIEGEL, J.   This is an action of contract against thirty-nine insurance companies to recover, under sixty-one insurance policies, damages resulting from a fire on the plaintiffs'[1] premises on July 11, 1960, and a "rekindling" of that fire on July 16, 1960.   The parties stipulated that the "question of liability" be submitted to the jury, and that the question of damages be reserved for subsequent hearings subject to the order of the trial judge.   The following questions were submitted to the jury: "Are the defendants named in Counts 1 through 24 and Counts 27 through 61 liable to the plaintiff[s]?" and "Is the defendant named in Counts 25 through 26 liable to the plaintiff[s]?"   The jury answered each question affirmatively.   "Thereafter the case was ordered tried before . . . [a judge] sitting without a jury . . . on the issue of what, if any, damages the plaintiffs were entitled to recover."   The judge found for the plaintiffs on policies covering damage to buildings and contents in the amount of $927,234, and on policies covering business interruption losses in the amount of $155,000.

---

[1] The buildings were owned by the plaintiff Charles Dowd Realty Co., Inc., and the plaintiff Charles Dowd Box Co., Inc. conducted the business on the premises in question and owned the machinery, equipment and inventory.   At the trial no distinction was drawn between the plaintiffs.

The plaintiffs' motion to amend the judge's findings to include interest from September 11, 1960, was allowed. The case is here on the defendants' exceptions.

At the trial on the issue of liability, there was evidence that the plaintiffs stored paper rolls in an open area. In March of 1960 construction began on an addition to an adjacent building in order to cover and protect the paper rolls from the weather. "At the start of construction at least 25% of the ground area by [*sic*] the new building was covered with roll stock." One witness testified that he was told "that we would have to work around this paper so that they could keep their operation going at all times." The plaintiffs' employees moved the paper rolls around within the area to facilitate construction as requested by the contractor. The contractor testified that this was "sound construction practice." The addition was a prefabricated structure, sheeted over with metal and held together with bolts — fasteners. "There was no welding in putting together the columns, roof trusses or the sidewalls." However, there was welding in connection with the removal of panels in the existing wall of the adjoining building and putting them in the walls of the new building — "generally in connection with sidewall panels in odd places where you couldn't get nuts and bolts in." This welding involved "maybe an hour or so, maybe once or twice a week." There was also some welding of braces to columns on one wall which "probably took 5 minutes for each side" of six or seven columns. The welding was done over a cement floor in an area which had been cleared of paper within a radius of ten to fifteen feet. There was testimony by a welder that "the space . . . [he] felt was safe in that area and there was no need to ask anybody to move it [the paper]."

On July 11, 1960, "the building was substantially complete, but there were still some minor things to do." The plaintiffs planned to install a sprinkler system, but had not yet done so. Some work was being done on the roof, and an employee of the contractor was welding a brace to one

of the columns. Feeling an unusual amount of heat, the welder turned and saw a fire between rolls of paper ten or fifteen feet behind him.

All of the fire insurance policies contained the following clauses: "Unless otherwise provided in writing added hereto this company shall not be liable for loss occurring . . . while the hazard is increased by any means within the control or knowledge of the insured . . . ."

"This policy being written at a rate based on the protection of the premises by the sprinkler system, it is a condition of this policy that . . . no unsprinklered additions or extensions shall be made to the building(s) unless immediate notification is given to the New England Fire Insurance Rating Association."

"Alterations and Repairs Clauses: (a) (This clause applies only to such item(s) that cover on or in one building.) Permission granted to make additions, alterations and repairs to the building or structure described; and this policy (insofar as it covers building or structure) shall also cover such additions, alterations and repairs when not otherwise covered by insurance, and shall cover all temporary structures, materials, equipment and supplies therefor on the premises described or within 100 feet thereof, and (insofar as it covers contents) shall also cover contents in such additions.

"(b) (This clause applies only to such item(s) as cover on or in two or more fire divisions.) Permission granted to make additions, alterations and repairs to the buildings or structures described, and to construct new buildings on the premises described; and this policy (insofar as it covers buildings or structures) shall also cover such additions, alterations and repairs and new buildings on the premises described when not otherwise covered by insurance, and shall cover all temporary structures, materials, equipment and supplies therefor on the premises described or within 100 feet thereof, and (insofar as it covers contents) shall also cover contents in such additions and new buildings.

"The above alterations and repairs clauses do not waive

or modify any of the conditions of the Automatic Sprinkler Clause, if any, applying to this policy.''

''Work and Materials: Permission granted for such use of the premises as is usual or incidental to the occupancy as described in this policy.''

The defendants excepted to the denial of their motion for directed verdicts and to the denial of their motion for a new trial on the grounds that the evidence showed ''there was an increase in risk and a breach of the sprinkler clause.'' They also took exception to the ''part of . . . [the judge's] charge where . . . [he] said that the Dowds had a right to use the warehouse while it was being constructed by its use of storing of paper,'' and ''[t]o the part of . . . [the judge's] charge where . . . [he] refer[s] to the Worcester Building Code and said that there is nothing in the Code to tell you when a sprinkler system should be installed.''

The defendants contend that verdicts should have been directed for them because ''[t]he absence of a sprinkler system and the presence of tons of combustible paper is a combination that increases the risk of fire beyond question,'' and ''[t]he change in use here was not temporary or casual.''

The presence of paper rolls in the area did not increase the hazard since they were stored there prior to construction; and there was no evidence to show that, when completed, the new metal building for housing the rolls would increase the risk of fire. The use of welding equipment during construction did increase the risk of fire, but the jury could have found that such use was casual or temporary. ''[A]cts [of the insured] increasing the risk must be more than casual or temporary; ordinary repairs and changes of the premises insured of a temporary character do not render a policy void although the property may be exposed to an additional hazard.'' *Thomson & Kelly Co.* v. *United States Merchs. & Shippers Ins. Co.* 263 Mass. 181, 187.

Further, the policy gave permission ''to make additions, alterations and repairs to the buildings or structures de-

scribed, and to construct new buildings on the premises described.'' This clause permits construction in a reasonable, proper and usual way even though such construction may increase the hazard. See *First Congregational Church* v. *Holyoke Mut. Fire Ins. Co.* 158 Mass. 475, 479–480. See also *Miller* v. *Spring Garden Ins. Co.* 202 Fed. 442, 443–445. Otherwise the permission to build would be illusory. There was evidence from which the jury could have found that the contractor followed sound construction practice and, therefore, there was no breach of the terms of the policy.

The defendants maintain that it was error for the judge to instruct the jury that '' [i]t is not contemplated . . . that in order to make the addition that the Dowd people are to shut up this warehouse area.'' They argue that the ''plaintiffs would have . . . no right to subject defendants to a greater risk than contemplated by the policies in order to save themselves inconvenience or business loss.'' But the policies expressly contemplated ''such use of the premises as is . . . incidental to the occupancy as described in this policy.'' This clause, when read with the clause permitting additions and new buildings, appears to us to allow the continuation of the business during construction. There was testimony that it was necessary to build around the paper ''so that . . . [the plaintiffs] could keep their operation going at all times,'' and there was no evidence to dispute this.

The defendants assert that verdicts should have been directed for them because the plaintiffs violated the contract provision which stated that ''no unsprinklered additions or extensions shall be made to the building(s).'' They maintain that the violation consists ''not in failing to install the sprinkler system but in using the addition prior to the installation of the sprinklers.''

The clause in question makes no mention as to whether the addition or extension may be used during construction prior to the installation of a sprinkler system. Insurance policies ''are to be construed most strongly against the insurer, and doubtful language is to be resolved against it ex-

cept in instances where the form or substance of the policy is prescribed by statute." *Cormier* v. *Hudson,* 284 Mass. 231, 234. *MacArthur* v. *Massachusetts Hosp. Serv. Inc.* 343 Mass. 670, 672. We will not import into these policies a condition favorable to the insurer which was not provided for by the terms of the agreement. We construe the sprinkler clause to allow the plaintiffs a reasonable amount of time in which to install a sprinkler system in any extension or addition. We are of opinion that there was sufficient evidence for the jury to find that the plaintiffs intended to install sprinklers and acted reasonably, although the sprinklers were not installed at the time the fire occurred.

Another contention of the defendants is that the trial judge erred when he stated: "There is nothing in the [Worcester city] ordinance that indicates that the sprinkler system is to be installed before the building is completed." The ordinance reads in part as follows: "An Automatic Sprinkler System shall be installed in the following buildings or parts of the building hereafter erected or altered . . . [i]n such portion of every building as is used for the storage, manufacture or sale of merchandise." The defendants argue that the ordinance requires the installation of the sprinkler system before using the addition for the storage of merchandise. We do not agree. The phrase "in such portion of every building as is used for . . . storage" identifies the type of building in which sprinklers must be installed, but not the time as of which the installation must be completed.

The defendants also excepted to the assessment of damages made by the judge. They contend that "the finding as to the amount of loss to buildings and contents . . . is not warranted." They point out that one Jaffee, an accountant who supervised the keeping of the plaintiffs' books, testified to damages totaling $956,256.10; and that after revisions and corrections in view of the judge's rulings and the waiver of certain items, the revised total was $911,487.65. They argue that Jaffee's testimony "was testimony within the corporate knowledge of the plaintiffs and

. . . bound the plaintiffs.'' Therefore, they maintain that the judge could not find damages of $927,234.

The judge was not compelled to believe any or all of Jaffee's testimony, nor was he restricted to such testimony. Several other witnesses saw the property of the plaintiffs before and after the fire and testified to the value of various items. A plaintiff is not bound by his testimony with regard to ''physical facts and objective matters which could have been observed as well by other witnesses as by the plaintiff,'' and he is ''entitled to the benefit of evidence from other witnesses more favorable to him.'' *Reynolds* v. *Sullivan*, 330 Mass. 549, 553. See *McFaden* v. *Nordblom*, 307 Mass. 574, 575; *Gleason* v. *Mann*, 312 Mass. 420, 423.

The plaintiffs contend that several witnesses testified to damages on particular items greater than the damages on those items estimated by Jaffee. The defendants, in their reply brief, state that ''the evidence would not warrant *some* of the findings on which plaintiffs' argument is based'' (emphasis supplied). However, the defendants make no specific argument with regard to certain testimony which the plaintiffs claim shows $10,493.92 more than the testimony of Jaffee. Our review of the record reveals that the plaintiffs' contention with regard to this testimony is correct.

The plaintiffs also contend that there was evidence to support a figure of $15,511 for the loss of flute rolls as opposed to the $10,525 estimated by Jaffee. The new flute rolls purchased by the plaintiffs to replace the ones damaged in the fire cost $15,521, and the damaged rolls had a junk value of $10. One Baker, the superintendent of the plaintiffs' plant, testified that the flute rolls which burned were ''the equivalent of brand new ones.''

The defendants argue that ''Baker, as is clear from the context of his testimony, was not saying that reconditioned rolls have the same value as new rolls; he was only saying that for purposes of performing the work, such rolls were as good as new.'' But Baker, when asked what the value of the two sets of flute rolls was before the fire, said, '' [a]

new set of rolls that I've seen estimates on, prior to this time, was $6,900.00 for a set." We think the judge could have drawn the inference that the value of the rolls destroyed was equal to the cost of new rolls.

The plaintiffs contend that there was evidence of $123,480 damage to the new building. Jaffee's figures for the value of the buildings were based on the estimates of one Harvey who testified that his estimate of the damage to the new building was $109,200 based on $7 a square foot applied to 15,600 square feet. The contractor who erected the building testified "that the canopy and loading dock are basically the same cost as the main building and that if they are included, the area is 17,640 square feet." The contractor, however, also stated that although the cost of this type of building was $7 a square foot, it would include the cost of excavation and fill.

The defendants argue that the contractor's estimate may not be used because it included the cost of excavation and fill. Those items are outside the policy which specifically states that it "does not cover cost of excavations." Nevertheless, the judge could have used the figure of $7 per square foot as the cost of the building relying on Harvey's testimony, to which no exception was taken. The trial judge could also have believed the testimony of the contractor that the total area to be considered in computing the cost was 17,640 square feet.

The defendants seem to argue that the plaintiffs' evidence in regard to damages was contradictory in that they claim a complete loss on the new building and yet contend that the building had not been completed. This argument ignores the testimony that the building was substantially completed and there was only minor work to be done.

The plaintiffs also contend that the testimony of one Koocher, a roofing contractor, that the cost of removing and replacing the roof includes a cost per square foot of "25 cents for the removal and carting away of the existing roof," is more favorable than the unit price of eighteen cents per square foot used by Harvey. This would result in a dif-

ference of $2,771.93. The defendants say that "Koocher's testimony was that he invoiced plaintiffs in the amount of $2,750 for work which included the replacement of a portion of [the] roof." However, Koocher also testified that he had "not completed the work and all bills have not been submitted."

The defendants assert that the amount of the contractor's profit should be five per cent rather than the ten per cent used by Harvey. They argue that the plaintiffs are bound by Harvey's agreement that the charge would be five per cent "if the Dowds . . . were willing to pay for the cost of labor and materials." We are of opinion that the judge would be warranted in finding that it was reasonable for the plaintiffs to refuse to take the risk of an increase in the cost of labor and materials.

The defendants also contend that an item for "Harvey Enclosures" was a duplication and, therefore, incorrect. This item involved the sum of $1,831.93. They point to Harvey's testimony in support of this view. We note, however, that in response to a question by the judge Harvey corrected this testimony and indicated, at least, that this item was not a duplication.

From our examination of all of the evidence most favorable to the plaintiffs, we are satisfied the judge was warranted in finding that the damage to the buildings and contents amounted to $927,234.

It is the defendants' contention that "the finding as to the amount of business interruption loss is not warranted." The defendants claim that although the plaintiffs proved a decrease in earnings they failed to show that it was attributable to the fire, and that there was no evidence to support Jaffee's assumption that the effect of the fire lasted at least a year. We do not agree.

There was testimony by the plant superintendent that: "By October 1, 1960, we were up to 65% or 70% of normal production but when severe winter weather arrived, it was down to 40% production. This continued during the winter which was one of the most severe. We were a fair

weather operation and were right out in the weather most of the time except for the temporary structures. . . . The Finishing Department . . . was still running at limited production even a year after the fire. We couldn't get the work away from it into the Shipping Department. Everything had to be loaded outside and we were a fair weather operation. When the weather was bad, we were bad." Jaffee testified that several machines were still not operative beyond a period of a year after the fire. He also stated that the figures supported his assumption that the plaintiffs would have received the same amount or a greater amount of orders in the year of the fire as in the previous year and that the books supported his assumption that the decrease in sales was due to the fire. Thus, there was ample basis to support a finding that the decrease in net sales during the year in question was due to the fire.

The defendants maintain that Jaffee erred in computing the actual loss sustained since he failed to deduct the fixed expenses of doing business in his calculations of the ratio of gross income to net sales. There is no merit to this argument. The purpose of the calculations was to determine from the decrease in net sales the actual loss sustained by the plaintiffs. There was no showing of a reduction in fixed expenses resulting from the decrease in sales, and therefore the fixed expenses did not affect the actual loss sustained by the plaintiffs as a result of the decrease in sales.

The defendants further assert that "there is no evidence that the claimed expenditures reduced the loss." They argue that there was no evidence to support Jaffee's assumption that the entire increase in payroll (except for salary raises) and the increase in utilities were due to the fire and expended in order to reduce business interruption loss.

The plant superintendent testified that because of the fire, the corrugator "ran at a reduced speed, and the employees were watching for foreign substances. More than the number of ordinary employees were used. . . . Because of conditions in the plant, the plaintiffs had quite a

number of extra people because of high absenteeism from the drafts and weather conditions that they had to work in. In the Finishing and Specialty Departments, it was necessary to put extra people on material movement to and from the machines. The plaintiffs had problems all through the plant with respect to flow of materials from station to station and this required extra employees. . . . The plaintiffs had to run longer shifts on the corrugator in order to keep it running, and this involved overtime. . . . The plaintiffs had a competitive position to maintain in the industry and it was essential in keeping their customers that the plaintiffs get the plant producing boxes.'' There is nothing in the record to suggest that any other factor not considered by Jaffee resulted in payroll increase. Consequently, the trial judge would have been warranted in accepting Jaffee's total of $113,153.27 as excess payroll and related expenditures caused by the attempt to reduce fire loss.

Jaffee calculated the increase in utility expense due to the fire on the basis of the ratio of utility expense to sales in the previous year. The existence of open areas and the need for overtime work obviously required extra utility expenditures. The method used to calculate this expense appears reasonable, and the defendants suggest no alternative.

When undisputed items such as temporary electrical services and wiring and temporary roof repairs are added to the other expenditures shown by the evidence to have been made to prevent business loss, it is clear that the judge was warranted in his finding of damages for business interruption in the amount of $155,000.

The defendants excepted to the allowance of the plaintiffs' motion to add interest from September 11, 1960. They argue that interest on the damages for business interruption was awarded ''from a date when the loss had not yet been fully sustained'' in violation of the policy provision that interest must be computed ''from the time when the loss shall become payable.''

The policies covering business interruption provide in pertinent part as follows:

"Requirements in case loss occurs: In case of any loss or damage under this policy, a statement in writing, signed and sworn to by the insured, shall be forthwith rendered to the company, setting forth the value of the property described . . . and the time at which and manner in which the fire originated . . . .

"When loss payable. In case of any loss or damage, the company, within sixty days after the insured shall have submitted a statement, as provided in the preceding clause, shall either pay the amount for which it shall be liable . . . or replace the property . . . ."

The plaintiffs submitted a notice of the fire during July and a sworn statement of loss due to business interruption on November 8, 1960, claiming a loss of $94,300. The "actual loss sustained" for which the plaintiffs contend the defendants were liable was based on the partial interruption of the business for a year and could not be ascertained until after June of 1961.

Since the policy requires payment only for the "actual loss sustained," the loss cannot be payable until the loss is sustained. The judge erred in assessing interest from September 11, 1960. Interest should be assessed from July 1, 1961, the date as of which the loss was calculated.

Finally, the defendants maintain that the trial judge erred in denying the following request for a ruling: "On all the evidence the Court is required to find that Francis Harvey was retained by the Plaintiff, Charles Dowd Realty Company, to prepare and present its fire loss claim originally made by him in the sum of $318,305.00 [for damage to the buildings] as shown in Exhibit 105 and subsequently revised in Exhibit 105A."

The record shows that "Jaffee testified that he prepared the claim that was the subject matter of the sworn statement which was made by Anna Dowd . . . . [T]his statement was mailed to each of the companies on which a claim was made for the fire damage." A portion of this claim was based on a report from Harvey who, "[a]t the request of plaintiffs, . . . examined the damage by fire to the build-

ings there.'' There was testimony which could support an inference that Harvey was an independent consulting engineer who was hired by the plaintiffs to estimate the damages to their buildings. The plaintiffs could use this estimate in such manner as they deemed advisable in preparing their claim for fire loss. The judge was not "required" to believe any testimony by Harvey which might suggest the contrary. See *Lydon* v. *Boston Elev. Ry.* 309 Mass. 205, 206–207; *Perry* v. *Hanover,* 314 Mass. 167, 170; *Graham* v. *Jordan Marsh Co.* 319 Mass. 690, 693.

The exception to the allowance of interest on damages for business interruption is sustained and the case is remanded for further proceedings in accordance with this opinion. All other exceptions are overruled.

*So ordered.*