Slade **GORTON** et al., Plaintiffs,

v.

The **PHOENIX INSURANCE COMPANY,**
Defendant.

Civ. A. No. 70–1288–W.

United States District Court,
D. Massachusetts.

Feb. 23, 1972.

Nathaniel M. Gorton, Powers & Hall, Boston, Mass., for plaintiffs.

Brian J. Moran, Boston, Mass., for defendant.

## MEMORANDUM OF FINDINGS AND RULINGS

CAMPBELL, District Judge.

I

The plaintiffs, Trustees of a Massachusetts Realty Trust, are suing the defendant insurance company upon a fire insurance policy relating to premises of the plaintiffs in South Boston (the "A" Street premises).

On December 13, 1968, a building on the "A" Street premises was severely damaged by a dynamite explosion. The blast was set off by a professional blaster hired by the plaintiffs to demolish a concrete block within the building. The plaintiffs claim that they are entitled under the policy to recover for so much of the loss to their building that exceeds the minor damage which was anticipated.

The terms of the policy are undisputed (Pl.'s Ex. 1). It is undisputed also that the policy was paid up, that it covered the building, and that proper notice and proof of loss were given.

It is agreed that if the defendant is liable, the plaintiffs are entitled to recover $12,000, that sum being the defendant's proportionate share of the loss (two other companies shared the risk with the defendant).

One of the plaintiff Trustees, Slade Gorton, is the principal officer of Slade Gorton, Inc., a firm in the wholesale fish distribution business, and of related firms. The Trust held the "A" Street premises for purposes of the Gorton fish business.

The "A" Street premises were acquired September 30, 1968, from Anderson Power Products Co. Consisting of 43,000 square feet, they contained a number of vacant industrial and commercial buildings, including the building which was the site of the explosion.

The Trustees planned to renovate the "A" Street premises to house the Gorton wholesale frozen fish business. One of the smaller buildings was torn down in the fall of 1968, but Slade Gorton and his fellow Trustees meant to retain the others.

The building where the loss occurred was to be remodelled to accommodate fish freezers. It was a 40' x 120' one story, industrial-type structure, built mainly of wood but with part of its walls of industrial tile. Its roof, of tar and gravel, was flat, with protruding sky-lights or "monitors". The floor was of cement.

Inside, some six feet from one of the 120 foot walls, was a massive concrete block which had been used as a hydraulic counterweight by the former owner. It was 9' x 9' square, and about 10' high. A 2' x 2' hollow core ran from top to bottom. The block is estimated to have weighed between 78 and 100 tons. It sat 3–4 feet off the cement floor on some kind of metal supports. The top of the block almost reached the ceiling, the distance from floor to ceiling being about 14' or 15'. Since the block had been designed to move up and down, there was a hole in the roof directly above it, and a framework above the roof, to accommodate the upward thrust of the block.

The plaintiffs wished to get rid of the block so that freezers could be installed in the building.

Rather than hiring an outside contractor, the plaintiffs had arranged to have all renovation work on the "A" Street premises done through a subsidiary of Slade Gorton, Inc., named Riverside, Inc. A Mr. Morrill, who had had experience in the building field, was hired by Riverside. Under his supervision, and the overall direction of Slade Gorton, carpenters and other workmen and sub-contractors were engaged as needed.

In October of 1968, an attempt was made to demolish the concrete block by use of jack hammers and air hammers. The drills broke off when they hit pieces of metal embedded in the concrete. Slade Gorton and Mr. Morrill concluded that while the block might eventually be broken up in this manner, the process was far too slow and expensive.

Their next thought was to blast the block out. Before engaging a blaster, Slade Gorton consulted with a Mr. Norwell, an insurance agent employed by Herbert Field & Co. The plaintiffs had just procured the fire insurance policy on the "A" Street premises (Pl.'s Ex. 1)

through Field & Co., the latter acting as their (not the defendant's) agent.

Mr. Norwell expressed the view that Mr. Gorton could go ahead with the blasting if he hired a licensed blaster.

Thereafter Mr. Morrill got in touch with Barclay Explosives, Inc. of Avon, Massachusetts, a firm run by a Mr. Barclay, an experienced, licensed blaster. Barclay had done work for Morrill in the past.

Conversations took place in late October and in November between Mr. Barclay, Mr. Gorton and Mr. Morrill. It is undisputed that Barclay was hired by the latter at a price of $350 to demolish the block. However, it is disputed whether (as Gorton and Morrill testified) Barclay told them that only minor damage to the building would ensue, or whether (as Barclay testified) he said that one entire wall and part of the roof would be damaged. No letter or written agreement bearing on the matter was prepared other than a release (Pl.'s Ex. 2) prepared by Barclay and signed by one of the plaintiffs, as follows:

December 10, 1968

"TO WHOM IT MAY CONCERN:

We have hired the Barclay Explosives, Inc. of Avon, Massachusetts to conduct a blasting operation for us on our premises located at 289 A Street, Boston, Massachusetts.

Because of the location of certain structures in close proximity to the blasting operations, we hereby release the Barclay Explosives, Inc., its heirs and assigns from any and all property damage that may occur, to property owned by the undersigned."

Upon contradictory testimony concerning the oral undertaking with Barclay, I find as follows:

Mr. Gorton and Mr. Morrill told Mr. Barclay of their previous futile efforts to destroy the concrete block; they asked if he could handle blowing the block to pieces by dynamite; Barclay told them that he could, although the blast would break glass in the skylights of the building and cause other minor damage. Gorton and Morrill were given the impression that Barclay could crack the block by dynamite with only minor damage resulting to the building—damage such as would cause "minor carpenter work".

Barclay instructed Morrill before the blast to remove some loose stock piled up in the building, so that it would not be covered by debris, and asked him to make sure that pipes and power lines were disconnected. Barclay agreed that for the total price of $350 he would also furnish a day's labor after the blast to help further break up the broken fragments of the block by air drill, and help Morrill's men remove them on a conveyor to be inserted through an opening to be cut in one side of the building.

The method for cracking the block adopted by Barclay, and described by him to Gorton and Morrill in November, 1968, was to be a single explosion. Barclay instructed Morrill to insert four pipes, one in each corner of the square, vertical hole in the block. Morrill was to fill the remainder of the core with cement. Sticks of dynamite were to be inserted by Barclay in the pipes on the day of the blast.

Morrill prepared the block as Barclay instructed.

There were pipes on the wall of the building within 5' or 6' of the block. I find that Morrill and Gorton did not discuss the future of these with Barclay.

I find that Morrill and Gorton did not discuss with Barclay specifically what would happen to the fragments of the massive block immediately after the explosion. Barclay was given to understand that the building was still to be used after the explosion. However, there was little specific discussion between Barclay and Gorton or Morrill on precisely what the consequences of the blast would be.

I find that Mr. Gorton was influenced to proceed with the dynamiting by the high cost of alternative methods, and that he was willing to adopt a method

which would cause some minor damage as the cheapest way to accomplish what he wanted.

I find that a reasonable man, knowing that a block composed of metal fragments and concrete, and of this size, location and shape, was to be cracked by a single blast of dynamite within a frame building, would at least have wondered what the effect of the explosion in the confined space would have on the roof (which the block nearly touched) and the wall (six feet away from the block).

While I accept Mr. Gorton's and Mr. Morrill's testimony that they relied on Mr. Barclay's skill and advice as a blaster, I find that Mr. Gorton was sufficiently conscious of the element of risk to call his insurance agent twice. The first conversation has already been described. The second call was occasioned by Mr. Barclay's request that the plaintiffs sign releases absolving him from liability for damage to the plaintiffs' property and from liability for personal injuries caused by the blast. The agent advised against execution of the latter-type release. The former release was signed.

I find that Mr. Gorton had no intention of "blowing up his own building". I find, however, that he authorized a blasting operation which he was told and knew would entail some "minor" damage to the building. I find that the facts and circumstances known to Mr. Morrill and Mr. Gorton were such as to suggest to an ordinary person that the damage might exceed "minor" damage.

I find that while Mr. Barclay had expressed oral reassurances that the damage would be "minor", Mr. Gorton at no time asked him to put such assurances in writing, nor does it appear that attention was focused upon specific precautionary measures.

There is no persuasive evidence that, in fact, the method adopted for demolishing the block was a reasonable, proper and usual method for accomplishing the desired result in a manner consistent with the safety of the building. The re-

sults of the explosion and the testimony of Mr. Barclay strongly suggest that it was not.

I find that Mr. Gorton did not before the blast communicate with the defendant or its agents, although he did communicate with his own insurance agent.

On December 13, 1968, Mr. Barclay came to the building, inserted the charges containing 5 or 6 pounds of dynamite, and had the area cleared of personnel. Necessary licenses had previously been secured.

The explosion which followed demolished a side of the building and much of the roof. It rendered the building a total loss.

The present claim followed.

## II

The defendant disclaims liability under the clause in the policy providing that the company "shall not be liable for loss occurring (a) while the hazard is increased by any means within the control or knowledge of the insured . . . . ."

I conclude on all the evidence that the hazard was increased by means within the control and knowledge of the plaintiffs, and that the defendant is accordingly not liable to the plaintiffs.

The plaintiffs contend that under Section IX(D) of the policy, permission was granted to make additions, alterations and repairs; that a dynamiting operation, when conducted by a licensed blaster, is a usual, reasonable and proper method of making an alteration to a building; and that accidental damage from the explosion (i. e. damage occurring beyond that which was anticipated) is compensable.

The plaintiffs' argument rests on the well-established principle that a "repairs" clause such as exists in the present policy permits

"construction in a reasonable, proper and usual way even though such construction may increase the hazard . . . . otherwise the permission to

build would be illusory." Charles Dowd Box Co., Inc. v. Fireman's Fund Ins. Co., 351 Mass. 113, 119, 218 N.E. 2d 64, 67 (1966).

The plaintiffs further contend that mere negligence by the blaster, or even negligence by the plaintiffs in authorizing the particular method adopted by the blaster, would not increase the hazard, within the meaning of the policy, it having been held in many cases that casual or temporary acts of carelessness do not increase the hazard. Thomson & Kelly Co. v. United States Merchants' & Shippers Ins. Co., 263 Mass. 181, 187, 160 N.E. 668 (1928).

My difficulty with the plaintiffs' arguments stems from the special character of the act, namely the use of dynamite, in a single indoor explosion, to demolish a massive block of concrete containing metal particles. Blasting has been commonly regarded to be an ultrahazardous activity. Restatement of Torts, §§ 519, 520. *See* Coughlan v. Grande & Son Inc., 332 Mass. 464, 466, 125 N.E.2d 778 (1955); McConnon v. Charles H. Hodgate Co., 282 Mass. 584, 587–588, 185 N.E. 483 (1933); Murphy v. Lowell, 128 Mass. 396, 397 (1880). In comment c. of § 520 of the Restatement, it is stated,

"Blasting is ultrahazardous because high explosives are used and it is impossible to predict with certainty the extent of severity of its consequences."

Comment (e) goes on to state that the "conditions" which require the use of blasting are usually of brief duration. "It is generally required because of the peculiar character of the land and *it is not a part of the customary processes of farming or building operations* . . . ." [Emphasis supplied]

It has been generally held in common law jurisdictions here and abroad that,

"[w]here the projected work involves high risk calling for special precautions, the employer . . . cannot renounce that responsibility by employing others . . . [W]here the use of implements or substances dangerous in themselves, like blow torches or explosives, is obviously incidental to the work to be performed, the employer 'has not merely a duty to take care but a duty to provide that care is taken' . . . . [T]his category is by no means restricted to situations which would qualify for outright strict liability." Fleming, The Law of Torts (3rd Ed. 1965).

*See* McConnon v. Charles H. Hodgate Co., 282 Mass. 584, 587–588, 185 N.E. 483 (1933), a blasting case, where the court approved an instruction reading in part:

" 'But if the work is dangerous in character and it will necessarily cause injury to other persons or property unless properly guarded against, . . . then the fact that it is done by an independent contractor will not absolve the person who employs the independent contractor from the negligence of the independent contractor.' "

*See also* Restatement of Torts 2nd Secs. 427 and 427A.

 While the above authorities do not deal directly with the present issue, which is the interpretation of the terms of a policy of insurance, they indicate that blasting is not part of the ordinary processes of building; that blasting has been classified as a peculiarly hazardous activity involving a greater level of risk than conventional building activities, and that one who engages in blasting is not shielded from responsibility by the hiring of an independent contractor.

It is true that courts, in construing the increased hazard clause, have been careful to avoid applying it to casual or temporary acts of carelessness. If they did, a policy of insurance would merely be a prelude to endless litigation by insurers; the purpose of insurance is to protect against one's own carelessness as

much as others. Similarly the repairs clause has been read so as to allow reasonable, proper and *usual* construction activities even though these increase the hazard; otherwise the permission to build would be "illusory". Charles Dowd Box Co., Inc. v. Fireman's Fund Ins. Co., *supra*, 351 Mass. at 119, 218 N. E.2d 64.

But courts have also recognized that some hazardous activities, if carried on regularly or if extraordinary in character, may sufficiently signal to all concerned that the hazard has been increased. Such was the case where a torch was used regularly over a long period of time to burn off the paint from a dry, inflammable building. First Congregational Church of Rockland v. Holyoke Mutual Insurance Co., 158 Mass. 475, 33 N.E. 572 (1893). Furthermore, the repairs clause does not extend coverage to unusual construction activities.

In the present case, the plaintiffs engaged in an activity which the law classifies generally to be ultrahazardous and which, in fact, turned out to be just that.

The plaintiffs have, moreover, offered no evidence, from independent experts or otherwise, that the single-blast method used to crack the block was a reasonable, proper or usual method to accomplish their aim safely, even if one were to assume that dynamiting, notwithstanding its ultrahazardous character, might on occasion be an acceptable means of construction under the repairs clause. While it is urged that dynamiting is a sophisticated activity, and while I have no doubt that this may be so, the only evidence before me of other blasting operations in enclosed areas (such as removal of a bank vault) showed the employment of painstaking procedures whereby multiple small explosions were used over a period of days to crack the object piece by piece.

Thus it is not necessary to decide here that all dynamiting is forbidden under the repairs clause. Suffice to say that the particular strategy employed bears the indices of a speculative and rather experimental approach in a field well known to be fraught with special dangers.

The plaintiffs contend that they are not responsible for the method employed by Mr. Barclay. He was, it is true, a licensed blaster. Yet the plaintiffs knew that a single blast of dynamite was to be used. It was obvious that an extraordinarily nice calculation would be needed to produce, on the one hand, an explosion sufficient to crack the block, and, on the other, one not so severe as to damage the building seriously. They knew that the wall and roof were in close proximity to the blast. They knew that some damage was anticipated. They knew that Mr. Barclay was sufficiently unsure of the safety of his technique to require a written release. They did not inquire as to what would happen after the blast caused the block to fragment—whether large chunks weighing tons would be propelled into the walls and roof.

Under all the circumstances, I conclude that the plaintiffs, not the defendant, must bear the responsibility for the loss. I conclude that the hazard was increased by means within the plaintiffs' control; that the increase was not incidental to proper, reasonable and usual construction techniques; and that the plaintiffs' actions were not the casual or temporary acts of negligence or carelessness for which the insurer would be responsible under the policy.

Accordingly, I find for the defendant. Judgment is to be entered accordingly.