United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 3, 1997 Decided October 28, 1997

 No. 96-7215

 Hartford Accident & Indemnity Company, 

 Appellant/Cross-Appellee

 v.

 Pro-Football, Inc., d/b/a Washington Redskins, 

 Appellee/Cross-Appellant

 Consolidated with

 No. 96-7222

 Appeals from the United States District Court 

 for the District of Columbia 

 (No. 94cv02266)

 Mark E. Solomons argued the cause for appellant/cross-
appellee. With him on the brief was Michael R. Goodstein. 
Paul H. Friedman entered an appearance.


 Barry W. Levine argued the cause for appellee/cross-
appellant. With him on the brief was Mark A. Packman.

 Before: Wald, Williams and Ginsburg, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Williams.

 Concurring opinion filed by Circuit Judge Wald.

 Williams, Circuit Judge: This case deals with a so-called 
"retrospective rating" insurance policy, evidently a type com-
mon for workers' compensation. The insured employer pays 
an estimated premium, which is typically based on data about 
the insured's payroll and the classifications of its employees 
for risk purposes, and which is subject to later correction. 
The classifications of course vary radically by activity; here, 
for example, the initial rate per $100 of payroll for "athletic 
team or park--contact sports"--the policy was issued to the 
owner of the Washington Redskins--was nearly 40 times the 
premium for "clerical office employees." The rates, fixed by 
law, also vary markedly according to the jurisdiction where 
employees may routinely seek compensation, depending on 
benefit levels and likelihood of recovery in the jurisdiction. 
They are, for example, far higher in the District of Columbia 
than in Virginia--more than double in this case. Both juris-
dictions allow recovery by an employee who is injured within 
their respective borders or whose employment is principally 
located there.

 The policy calls for initial payment of an estimated premi-
um, to be followed by adjustments to reflect actual circum-
stances. Here, during the third of three successive one-year 
policies, the District of Columbia Court of Appeals affirmed 
the decision of the D.C. Department of Employment Services 
that the players performed "the principal services for which 
they were hired" in the District, where they played their 
home games (R.F.K. Stadium), rather than in Redskins Park 
in Virginia, where they spend a majority of their time at 
practice. Pro-Football, Inc. v. D.C. Department of Employ-
ment Services, 588 A.2d 275 (D.C. 1991) ("Anderson"--so-
called after one of the player claimants). The players were 


thus entitled to invoke D.C. law as a basis for recovery for 
injuries occurring anywhere (as the players had sought 
throughout the period of the three policies).

 The parties agree that the provisions on premium adjust-
ment allow the insurer to make a retrospective premium 
change to reflect changes in the employer's payroll or in the 
job classifications of particular employees. The question is 
whether the terms of the policy also permit a premium 
adjustment for a change in the jurisdiction whose law is 
available to employees, such as resulted from the Anderson 
decision. The district court read the policy as denying the 
insurer such a power. We reverse.

 

 * * *

 Hartford Accident and Indemnity Company provided the 
Washington Redskins' owner/operator, Pro-Football, Inc. 
("PFI"), with a workers' compensation insurance policy for 
three successive annual policy periods, from July 14, 1988 to 
July 14, 1991. The policy was a standard form, assigned risk 
policy administered by the National Council on Compensation 
Insurance ("NCCI"), designed for employers like PFI who 
cannot purchase coverage on the voluntary workers' compen-
sation market and who cannot or are not willing to self-
insure. See generally 9 Arthur Larson & Lex K. Larson, 
Larson's Workers' Compensation Law ss 92.53-92.65 (1997) 
(describing assigned risk, retrospective rating policies). Un-
der the policy, PFI's premiums were initially based on the 
parties' use of Virginia as the expressly assumed principal 
location of the players' services.

 Under both the District of Columbia and the Virginia 
workers' compensation insurance plans ("WCIPs"), the NCCI 
directs insurers in the state pool to issue coverage to employ-
ers eligible for assigned risk insurance. When PFI submitted 
an application for Virginia assigned risk coverage, NCCI 
assigned the application to Hartford, which was obligated to 
issue a policy. The policy issued by Hartford consisted of 
manuals (by reference), standard forms, an Information Page 
(actually several pages) of figures specific to PFI, and rates; 
the forms and manuals were approved, and the rates set, by 


NCCI. (The policy forms for the District and Virginia 
WCIPs are identical in all material respects.) The terms and 
rates for the policy were not negotiated; neither Hartford 
nor PFI could legally have altered them.

 Retrospective rating plans of the sort embodied in this 
policy are used when the size of the insured's risks is difficult 
to measure at the beginning of the policy period, see Lee R. 
Russ & Thomas F. Segalla, 5 Couch on Insurance s 69.15 (3d 
ed. 1996) ("Couch"). Courts routinely enforce the retrospec-
tive provisions in such plans. See, e.g., L.C. Worley v. 
Travelers Indemnity Co., 183 S.E.2d 91 (Ga. Ct. App. 1971); 
Great American Ins. Co. v. Nova-Frost, Inc., 362 N.W.2d 358 
(Minn. Ct. App. 1985); Texas Soap Mfg. Co. v. American 
Auto. Ins. Co., 227 S.W.2d 376 (Tex. Civ. App. 1950). Work-
ers' compensation in general, and professional football in 
particular, present the kind of uncertainty that makes retro-
spective rating appropriate, because the insured's activities 
and the size of its payroll are likely to vary considerably over 
the course of the policy term.

 Premiums under the policy are calculated as the product of 
the work classification rate for a specific jurisdiction and the 
amount of payroll allocated to employees in that classification 
and jurisdiction (the "premium basis") up to a regulated 
maximum amount. Initial premiums (at least for years other 
than the first one) also incorporate an "experience modifica-
tion factor" (or "mod"), a prospective adjustment to take 
account of prior years' claims experience for the particular 
employer. All the factors other than actual payroll--the 
rates, classifications, premium basis maxima, and mod--are 
set by NCCI.

 Following attempts by several injured Redskin players to 
collect the higher District benefits for injuries received out-
side the District, the Director of the District of Columbia 
Department of Employment Services ruled on or about July 
10, 1989, just before the end of the first policy year, that the 
players' place of principal employment was the District rather 
than Virginia. The D.C. Court of Appeals issued its decision 
in Anderson, affirming the Director, in March 1991.


 Hartford, relying upon the policy provision that allowed 
calculation of the "final premium" after the policy's expira-
tion, then wrote PFI that it had reclassified Redskin players 
and coaches as District of Columbia employees for all three 
policy years. For the then-current policy year, 1990-91, 
Hartford issued an endorsement, or formal amendment, im-
plementing the reclassification. Hartford then billed PFI for 
the difference in premium levels--a difference, after adjust-
ments, of $5,350,762. PFI refused to pay, and Hartford filed 
suit under the federal courts' diversity jurisdiction. PFI 
counterclaimed for breach of contract and fiduciary duty, 
fraud, bad faith, and negligent misrepresentation.

 On cross-motions for summary judgment the district court 
granted summary judgment for PFI, ruling that the policy 
did not permit Hartford to change the jurisdictional basis of 
the premium calculation retroactively. Hartford Accident & 
Indemnity Co. v. Pro-Football, Inc., d/b/a The Washington 
Redskins, No. 94-2266 (D.D.C. Aug. 21, 1996) ("Mem. Op."). 
The district court also suggested that any reclassification 
might have to be by formal endorsement, which Hartford had 
failed to issue except for the final policy year at issue. 
Finally, the district court struck the affidavit of a Hartford 
expert because it was submitted after the close of discovery, 
and rejected PFI's counterclaims as time-barred under the 
District's statute of limitations. All of these decisions are on 
appeal.

 I.

 The district court noted, and the parties agree, that the 
task in contract interpretation is to decide "what a reasonable 
person in the position of the parties would believe the lan-
guage meant." Mem. Op. at 8 (citing 1010 Potomac Assoc. v. 
Grocery Mfrs. of America, Inc., 485 A.2d 199, 205 (D.C. 
1984)). In the particular context of insurance, under District 
of Columbia law,

 [s]ince insurance contracts are written exclusively by 
 insurers, courts generally interpret any ambiguous provi-
 sions in a manner consistent with the reasonable expecta-


 tions of the purchaser of the policy. However, when 
 such contracts are clear and unambiguous, they will be 
 enforced by the courts as written, so long as they do not 
 'violate a statute or public policy.'

Smalls v. State Farm Mut. Auto. Ins. Co., 678 A.2d 32, 35 
(D.C. 1996) (citations omitted). See also GEICO v. Fetisoff, 
958 F.2d 1137, 1141 (D.C. Cir. 1992) ("Under District of 
Columbia law, '[c]lear and unambiguous language [in an in-
surance policy] should be construed according to its everyday 
meaning.' ") (quoting Continental Casualty Co. v. Cole, 809 
F.2d 891, 896 (D.C. Cir. 1987)). Thus, as we understand 
District law, no preference for the insured's reading arises 
unless the contract is ambiguous, and even then the prefer-
ence involves no more than accepting what the insured might 
reasonably believe over an alternative reasonable interpreta-
tion offered by the insurer.

 The parties also wrestle with the issue of whether the 
special status of this insurance contract--imposed on the 
parties as NCCI's standard form--calls for any modification 
of the standard rule for interpreting insurance contracts. 
Commentators have urged, and many (perhaps most) jurisdic-
tions have agreed, that since the basis for the standard rule--
the insurer drafted the contract without negotiating it with 
the insured--is absent, the presumption in favor of the in-
sured's reasonable interpretation should be relaxed: "The 
rule of construction against the insurer does not apply where 
... the language was prescribed by statute and controlled by 
Division of Insurance rather than the individual insurer." 2 
Couch s 22:15. See also John A. Appleman & Jean Apple-
man, 13 Appleman, Ins. L. & P. s 7407 (1981) ("While North 
Carolina and a few other states still apply the doctrine of 
construing policies against the insurer to instances of stan-
dard policies, the better authority is to the effect that the 
doctrine of liberal construction has no place under those 
circumstances.").1 There appears to be no District of Colum-

__________
 1 Accord, e.g., Kisting v. Westchester Fire Ins. Co., 290 F.Supp. 
141, 147 (D.C. W.D. Wis. 1968), aff'd, 416 F.2d 967 (6th Cir. 1969) 
(applying Wisconsin law); Hankins v. Public Service Mut. Ins. Co., 
63 A.2d 606 (Md. 1949); Charles Dowd Box Co. v. Firemen's Fund 


bia precedent on the construction of state-mandated policy 
language or forms. In any event, because we do not find the 
language ambiguous, or as reasonably permitting PFI's pro-
posed interpretation, we need not resolve that contest.

 We now turn to interpreting the policy itself. (The text of 
the key printed provisions of the policy--the "boilerplate"--is 
set forth in the Appendix.)

Did the Final Premium Clause entitle Hartford to adjust the 
 premium for jurisdictional change?

 The Final Premium Clause explicitly describes the premi-
um shown on the Information Page as "an estimate" and 
states that the "final premium will be determined after this 
policy ends by using the actual, not the estimated, premium 
basis and the proper classification and rates that lawfully 
apply to the business and work covered by this policy." 
Hartford's decision to charge District rates for the players 
and coaches in 1991 in the wake of Anderson tracks these 
terms. Thereafter, only the D.C. classifications and rates 
would qualify as the "proper classification and rates that 
lawfully apply" to the affected employees. The logic of any 
insurance policy, prospective or retrospective, requires premi-
um levels to track expected benefits.2 A retrospective-rating 
policy allows post-signature events to affect both sides of the 
balance. Here Hartford accounted for a large, legally man-
dated, rise in benefit levels through an appropriate adjust-
ment to its premium calculation, as the policy contemplated.

 The district court came to a contrary conclusion--here 
urged on us by PFI--by treating the Final Premium Clause 

__________
Ins. Co., 351 Mass. 113, 218 N.E.2d 64 (1966); Del Guidici v. 
Importers' & Exporters' Ins. Co., 120 A. 5 (N.J. 1923).

 2 As used here, "expected" refers to the average of possible 
outcomes, each specific outcome discounted for its probability.


as limited by the Classifications Clause. It read the latter as 
contemplating only changes to business and work classifica-
tions (and the rate and premium basis changes that follow a 
classification change). It then read the Final Premium 
Clause as permitting Hartford to make only two types of 
independent changes to the policy factors: changes to premi-
um basis (payroll) determined under the Audit Clause, and 
changes to work classifications determined under the Classifi-
cations Clause; rate adjustments would be restricted to the 
consequences of changes in these two types of factors. Mem. 
Op. at 9-11. This interpretation left no room in the Final 
Premium Clause for a change in rates corresponding to a 
change in the workers' jurisdictional basis, whether the 
change arose from an exogenous legal event such as the 
Anderson decision, or from changes in actual work location 
(or new information about work location) such as might be 
revealed during the audit process.

 This reading sacrifices the fundamental principles of the 
policy to symmetry--and a false symmetry at that. The 
Final Premium Clause calls comprehensively for retrospective 
adjustment of the premium to conform to "the actual ... 
premium basis and the proper classification and rates that 
lawfully apply." Here the D.C. Court of Appeals reached a 
conclusive (and retroactive) determination that the jurisdic-
tional predicate of the players' benefit eligibility was not, in 
fact, Virginia, but rather the District of Columbia. Hartford 
correctly concluded that the change in the jurisdictional pred-
icate for benefits entailed a matching change in the "actual" 
rates. PFI's reading, by contrast, rewrites the phrase "prop-
er classification and rates" to eliminate any independent 
meaning for "rates."

 We see no basis for the assumption that the Audit Clause--
authorizing inspection of the insured's books for up to three 
years after the policy period for information to "be used to 
determine final premium"--must refer solely to changes in 
premium basis (i.e., payroll limited by the NCCI-imposed 
maxima). Mem. Op. at 10. An audit might reveal, as Hart-
ford's apparently did, see Appendix for PFI on Cross-Appeal 
at 106, that all claims by players are being filed in another 


jurisdiction. Since it is the function of the Audit Clause to 
gather data for the correct calculation of the premium, it 
would be arbitrary to perform the final premium calculation 
in disregard of a highly relevant fact so gathered, simply 
because the scope of the Classifications Clause is limited to 
changes in classifications.

 In fact, the Information Page states, "All information re-
quired below is subject to verification and change by audit." 
The information set forth "below" included rates calculated 
for various job classifications on a jurisdiction-specific basis, 
so that the natural, indeed inescapable, reading is that the 
provision for change applies to the jurisdictional as well as 
the other aspects of the premium calculation. By contrast, on 
a narrow reading of the Audit Clause's scope, it remains 
mysterious how information relevant to the Classifications 
Clause will be gathered except through the insured's good-
faith disclosure. But under a harmonious reading of the 
three clauses, the Audit Clause has potential to generate data 
for all aspects of the Final Premium calculation, as well as for 
reclassifications under the Classifications Clause.

 Granted, our construction of these clauses makes partially 
redundant the separate clause governing ordinary, non-
jurisdictional, changes to work classifications. Why should 
such changes be addressed not only in the Audit and Final 
Premium Clauses, but also in a special clause of their own, 
the Classifications Clause? One plausible answer is that 
changes sought by the insurer to work classifications may be 
likely to engender the greatest resistance by the insured, and 
may be the most disputable, so the function of the special 
Classifications Clause is just to underscore the insurer's 
power to make those changes. In any event, PFI's reading of 
the clause to suggest that it puts jurisdictional changes 
entirely off the map presents a far greater anomaly, for under 
PFI's reading the insurer would be unable to adjust for a 
change in one of the most significant elements in its expo-
sure. 

 PFI appears to believe that somewhere in the policy Hart-
ford promised that the rates for players would be calculated 


on the assumption that Virginia was their principal place of 
employment, regardless of whatever might prove the case. It 
is not clear just where PFI finds any such promise. One 
possibility is the page of the Information Page that covers the 
players (as well as the clerical staff working at Herndon and 
the athletic team operational staff), which says, as a heading: 
"Named Insured and Location Address of Operations Cov-
ered by this Schedule," together with the address of the 
Herndon facility. (A similar page covers those understood to 
be working in the District.)

 Far from representing any promise, however, the heading 
appears to be no more than a device for organizing informa-
tion, framing the then-estimated classifications, rates and 
payroll for the workers thought to be located at the places 
shown on the particular pages. Furthermore, as Hartford 
rightly points out, PFI's restrictive reading would illogically 
bind the insurer to the insured's declaration of address 
despite misrepresentation, a simple out-of-state move during 
the policy year, or an honest error. PFI offers no construc-
tion of the policy that applies the retroactive adjustment 
clause to any of those scenarios. Nor does it explain why the 
parties would limit the insurer to such alternative remedies as 
a fraud claim (which would encompass only some misrepre-
sentation cases) or a rise in the mod (which would be prospec-
tive only).

 Courts in other jurisdictions, faced with similar or identical 
policy language, have held that the retrospective rate-
changing power encompassed erroneous jurisdictional assign-
ments. In D.A.X., Inc. v. Employers Ins. of Wausau, 659 
N.E.2d 1150 (Ind. Ct. App. 1996), the insurer discovered that 
the policy's jurisdictional assumption was wrong. The in-
sured, an employee-leasing company, had declared that its 
operations were entirely in Indiana, because of its office 
location. Because the insurer found that claims were being 
filed in Illinois, it launched an audit under the standard Audit 
Clause, concluded that under rules promulgated by NCCI the 
correct site was Illinois, and accordingly adjusted the premi-
um. The trial court enforced the insurer's claim to the higher 
premium. On appeal the insured claimed that the trial court 


judgment had wrought an unconstitutional "impairment" of 
contract and an unjustified contract reformation. The appel-
late court rejected both theories, finding that the trial court 
"simply enforced the contract the way it was written." Id. at 
1156. The court read the Final Premium Clause (identical to 
the clause at issue here) as permitting the insurer to use the 
"rates and classifications from such other states as may 
lawfully apply," which, given the NCCI rating rule, meant the 
Illinois rates. Id. at 1157.

 And in a New Hampshire case also involving a retrospec-
tive rating policy, with language similar though not identical 
to ours, the insurer discovered during its post-policy audit 
that many of the insured's employees, classified as working in 
New Hampshire, had in fact been working in Massachusetts, 
and accordingly recalculated the premium. Continental Ins. 
Co. v. Seppala & Aho Constr. Co., Inc., 430 A.2d 157 (N.H. 
1981). A clause--the counterpart of our Final Premium 
Clause--stated that "the earned premium," as opposed to the 
initial "estimated premium," "shall be computed in accordance 
with the rule, rates, rating plans, premiums and minimum 
premiums applicable to this insurance." Id. at 158. The 
court held that this clause clearly and unambiguously gave 
the insurer the power to re-rate the policy with a corrected 
jurisdictional classification--indeed, to the point of making 
clear that the insurer's agent had no authority to represent 
that only New Hampshire rates would be charged. Id. at 
159. We agree with these decisions.

Must Hartford's power to correct the premium be exercised 
 through an endorsement?

 There are two provisions that might give rise to an obli-
gation by Hartford to exercise its premium-revising power by 
means of an endorsement. First, PFI relies on Subsection A 
of the "General Section," which provides that the "terms of 
this policy may not be changed or waived except by endorse-
ment issued by us to be part of this policy."

 But we do not see the insurer's exercise of the power 
expressly granted by the Final Premium Clause as the 


"change" of a term of the Policy: it is an exercise of a power 
that a specific policy term--the Final Premium Clause--
expressly grants the insurer to use "the actual, not the 
estimated, premium basis and the proper classification and 
rates that lawfully apply to the business and work covered by 
this policy" (emphasis added). That, of course, was the view 
of the courts in D.A.X. and Continental Insurance. More-
over, the Final Premium Clause expressly says that the final 
premium "will be determined after this policy ends." It 
seems odd to say that an activity explicitly slated to occur 
after the policy "ends" constitutes a "change" of the then-
expired policy's terms. (PFI's theory, incidentally, further 
entails--implausibly, given the Audit Clause--that application 
of the Final Premium Clause to correct premium basis would 
also require an endorsement.) Because PFI's reading of 
Subsection A fails to accord independent force to the Final 
Premium Clause, it fails to give "a reasonable, lawful, and 
effective meaning to all [the policy's] terms." 1010 Potomac 
Assoc., 485 A.2d at 205.

 Moreover, PFI offers no rationale whatsoever for applying 
the General Section endorsement requirement to adjustments 
under the Final Premium Clause. Hartford, by contrast, 
suggests that endorsements are issued only during a policy's 
term, and that the purpose of the requirement is to provide 
notice to the insured to enable it to decide either to cancel or 
at least not to renew the policy. We do not feel qualified to 
embrace that view, but it is, at least, a plausible one.

 We can imagine two ways that a post-expiration endorse-
ment requirement might possibly have some purpose beyond 
that contributed by the final billing itself.3 First, an endorse-
ment requirement might make it easier for insurance regu-
lators to monitor assigned risk policies in their jurisdictions, 
as is apparently the regulators' charge under the D.C. WCIP. 
See D.C. WCIP at 9 ("The Plan Administrator shall monitor 
and review servicing carrier performance by ... (3) conduct-

__________
 3 Although these arguments were not advanced by either party, 
we raise them ourselves in order to test whether our own reading of 
the contract is indeed the only reasonable construction of its terms.


ing on-site audits; and (4) reviewing any other information 
that relates to the servicing carrier."). Both D.C. and Virgi-
nia require that copies of the policy declarations "and all 
endorsements" must be filed with the appropriate administra-
tor, see D.C. WCIP at 7, Virginia WCIP at 2.

 But if regulators want information on ultimate premiums 
paid, a requirement of endorsements for jurisdictional 
changes under the Final Premium Clause is a strangely 
incomplete solution. We know that the final bill will reflect 
changes to estimated payroll, but even PFI does not contend 
that a post-expiration, ordinary correction of the payroll 
constitutes a "change" to the policy, such as to warrant 
formal endorsement. Either the regulators do not depend on 
a formal endorsement process for their information-gathering 
needs, or they don't monitor the policies as closely as this 
suggestion assumes.

 A second possible justification for requiring post-policy 
jurisdictional adjustments to take the form of endorsements 
might look to the interests of employee-claimants. If the 
jurisdictional possibilities open to claimants were governed by 
the insurance contract, specification of jurisdictional change 
in an endorsement might make it easier for claimants to 
ascertain their appropriate jurisdictional bases. Of course, 
the premise is faulty. Claimants' jurisdictional options de-
pend on state law, as Anderson shows, not on arrangements 
between the employer and its insurer.

 Thus an endorsement attached to a final premium billing, 
issued after the expiration of a policy, would perform no 
notice function beyond that of the billing itself. It would be a 
purely formal gesture.

 Unsurprisingly, PFI has shown no reason to think that it 
was harmed by Hartford's non-issuance of an endorsement 
when it made its final billing for the expired terms.4 By 

__________
 4 PFI does claim that it was injured by Hartford's not having 
issued an endorsement immediately after the Director's initial 
adverse Anderson decision and instead waiting until the D.C. Court 
of Appeals ruling to change the policy rates. Whatever the merits 


contrast, Hartford's behavior in issuing an endorsement only 
to the current 1990-91 policy year is consistent with the 
rationale for the requirement: it provided PFI with notice in 
case it should wish to find other insurance or self-insure in 
the future (as apparently it chose to do).

 An alternative source of an endorsement requirement 
would be the Classifications Clause's statement that if expo-
sures are different from those described by the estimated 
classifications, "we will assign proper classifications, rates and 
premium basis by endorsement to this policy" (emphasis 
added). Since PFI's position rests heavily on a notion that 
the Classifications Clause does not cover jurisdictional 
change, and Hartford agrees on that point, it seems plain that 
it cannot be a source of any endorsement obligation that 
would be applicable here.

 Accordingly, we reverse the grant of summary judgment in 
favor of PFI and remand for the district court to enter 
summary judgment for Hartford.

 II.

 The district court rejected PFI's counterclaims as time-
barred by the District of Columbia statute of limitations. 
Since PFI's claims arise under District law, the applicable 
statute of limitations is also that of the District. See Guar-
anty Trust Co. v. York, 326 U.S. 99 (1945); Kuwait Airways 
Corp. v. American Security Bank, N.A., 890 F.2d 456, 460 
(D.C. Cir. 1989). This is true even though Rule 12(a)(4) of 
the Federal Rules of Civil Procedure extends the time for a 
responsive pleading to ten days after the denial of a motion 
under Rule 12, and PFI advanced its counterclaim in an 
answer timely filed under that rule. See 6 Charles Alan 
Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice 
& Procedure 1419 (2d ed. 1990, Supp. 1997).

 An agreement between the parties tolled the statute until 
October 22, 1994; PFI's answer and counterclaim were filed a 

__________
of this defense, it depends entirely on the timing, not the form, of 
Hartford's action and was not the basis of the district court's ruling.


year later. But Hartford filed its complaint on October 20, 
1994, and defendant argues that this further tolled the stat-
ute. While there is considerable law (and sensible policy) on 
PFI's side, the controlling law--that of the District--is 
against it.

 In Sears, Roebuck and Co. v. Goudie, 290 A.2d 826 (D.C.
1972), the court considered whether a counterclaim filed too 
late (assuming no tolling) could be saved by the doctrine of 
relation back to a prior, timely counterclaim that had been 
dismissed on substantive grounds. The court found no rela-
tion back because the new counterclaim was insufficiently 
related to the dismissed one. Id. at 830. A necessary 
premise of the entire discussion was that the filing of the 
complaint did not toll the statute on the counterclaim. And 
the court made this premise specific, saying that a genuine 
counterclaim, i.e., one going "beyond matters of defense" such 
as recoupment, "must be viewed as an affirmative cause of 
action and should therefore be tested apart from the primary 
claim in determining whether the statute of limitations 
would bar the counterclaim." Id. (emphasis added). This 
superseded the contrary, more lenient, rule of De Vito v. 
Hoffman, 199 F.2d 468 (D.C. Cir. 1952). Because PFI's 
counterclaims concededly go "beyond matters of defense," 
they must be assessed separately, and thus fail.

 III.

 In the course of its ruling on the cross motions for sum-
mary judgment, the court held that the parties' failure to 
observe discovery rules--specifically failure to request exten-
sion of a discovery deadline--barred use of experts' affidavits 
submitted to bear upon the construction of the policy. Mem. 
Op. at 12 n.10. Hartford contests the exclusion of its expert's 
affidavit.

 Hartford's contention appears moot--at least in the sense 
that, as we have construed the portions of the policy relevant 
to this appeal without consideration of any extrinsic evidence, 
such evidence can make no contribution to resolution of the 
case. Hartford suggests, however, that we should address 


the court's discovery ruling because, even if it wins on the 
basic issue of its power to adjust the premium by reference to 
jurisdictional mistake, as it has, "[d]amages would still need 
to be addressed."

 At the time the district court exercised its discretion in 
ruling on this discovery issue it was simultaneously making 
summary judgment rulings that brought the case to a com-
plete end (subject, of course, to appellate review). We do not 
know if that circumstance colored the court's ruling on the 
issue. Rather than entangle ourselves in what is surely a 
messy issue, and perhaps a completely unnecessary one, we 
simply note that if indeed there are remaining factual issues 
to be resolved on remand, the court may wish to re-examine 
its discovery ruling. 

 * * *

 Accordingly, the judgment of the district court is reversed 
in part and affirmed in part, as stated above.

So ordered.

 


 APPENDIX

General Section

A. The Policy

 This policy includes at its effective date the Information 
Page and all endorsements and schedules listed there.... 
The only agreements relating to this insurance are stated in 
this policy. The terms of this policy may not be changed or 
waived except by endorsement issued by us to be part of this 
policy.

 

Part Five--Premium

A. Our Manuals

 All premium for this policy will be determined by our 
manual of rules, rates, rating plans and classification. We 
may change our manuals and apply the changes to this policy 
if authorized by law or a governmental agency regulating this 
insurance.

B. Classifications

 Item 4 of the Information Page shows the rate and premi-
um basis for certain business or work classifications. These 
classifications were assigned based on an estimate of the 
exposures you would have during the policy period. If your 
actual exposures are not properly described by those classifi-
cations, we will assign proper classifications, rates and premi-
um basis by endorsement to this policy.

C. Remuneration

 Premium for each work classification is determined by 
multiplying a rate times a premium basis....

E. Final Premium

 The Premium shown on the Information Page, schedules, 
and endorsements is an estimate. The final premium will be 
determined after this policy ends by using the actual, not the 
estimated, premium basis and the proper classification and 


rates that lawfully apply to the business and work covered by 
this policy. If the final premium is more than the premium 
you paid to us, you must pay us the balance....

G. Audit

 You will let us examine and audit all your records that 
relate to this policy. These records include ledgers, journals, 
registers, vouchers, contracts, tax reports, payroll and dis-
bursement records, and programs for storing and retrieving 
data. We may conduct the audits during regular business 
hours during the policy period and within three years after 
the policy period ends. Information developed by audit will 
be used to determine final premium....



 Wald, Circuit Judge, concurring: I differ with the reason-
ing of the majority on only one aspect of this case, the issue 
of whether the Final Premium Clause should be read to 
permit Hartford to change the jurisdictional basis of closed 
policies without issuing an endorsement.

 I find the evidence on which the majority relies on this 
issue--policy language, caselaw, and the purported lack of 
any reason for requiring endorsements to closed policies--
unconvincing. The language of the Final Premium Clause 
seems to me to be ambiguous. It could be read to provide 
the insurer with only a substantive right to adjust the terms 
of a closed policy, or it could also furnish a specific procedure 
for doing so, and so excuse compliance with the General 
Section's endorsement requirement. As for the cases cited 
by the majority, D.A.X., Inc. v. Employers Ins. of Wausau, 
659 N.E.2d 1150 (Ind. Ct. App. 1996) and Continental Ins. Co. 
v. Seppala & Aho Constr. Co., 430 A.2d 157 (N.H. 1981), in 
neither of them does it appear that any party raised the 
question of whether an endorsement was required to effect a 
change in policy terms. (Indeed, the policies involved may 
not have even contained an endorsement requirement like the 
one here.) Nor do I agree with the majority's conjecture that 
requiring endorsements to closed policies would be a "purely 
formal gesture." Majority opinion at 13. Formality can, at 
times, be very useful. The record now before us contains 
little evidence about the practices of the insurance industry or 
the usual behavior of regulators, and the parties did not 
argue this issue in any detail. We simply cannot be certain 
that insurers, insureds, and third parties would have no use 
for endorsements to closed policies.

 Ultimately what I find dispositive in this case is that the 
parties' course of performance under the policy indicates that 
they appeared to have implicitly agreed that the Final Premi-
um Clause permitted changes in policy terms without an 
endorsement. "[E]vidence of circumstances surrounding the 
contract formation and the parties' conduct in performing it 
is relevant to ascertaining their intent." Dano Resource 
Recovery, Inc. v. District of Columbia, 620 A.2d 1346, 1653 
(D.C. 1993) (emphasis added). In October 1989, after the 


1988-89 policy had closed, Hartford audited that policy year 
and issued a "Statement of Premium Adjustment," presum-
ably under the Final Premium Clause, which set forth revised 
figures for PFI's payroll and associated adjustments to the 
policy premium. No corresponding endorsement is appended 
to the copy of the 1988-89 policy that appears in the record. 
I find this to be strong enough evidence that the parties read 
the Final Premium Clause as providing both a substantive 
right to change policy terms and a procedure for effecting 
such changes to concur with the result reached by the panel.1

__________
 1 I agree with the panel majority that we need not decide whether
the doctrine that ambiguities in a contract are construed against its 
drafter applies in this case. In discussing this issue in dicta, 
however, the majority observes that it is unclear how District of 
Columbia law would treat state-mandated policy language. In fact, 
NCCI, the entity that drafted the policy language, appears to be 
dominated by the insurance industry. See William Hager, Data 
Value Depends on Accuracy, Not `Independence', Nat'l Underwrit-
er Prop. & Cas. Risk & Benefit Mgmt. Dec. 13, 1993 (stating that, 
of twenty-one seats on NCCI's board of directors, all but four are 
occupied by insurance industry representatives). The question, 
therefore, might be better framed as how District of Columbia law 
would treat a policy whose use is mandated by law, but which was 
ultimately drafted by an entity with interests closely aligned with 
those of the insurer.