**D.A.X., INC., Appellant–Defendant,**

v.

**EMPLOYERS INSURANCE OF WAUSAU, Appellee– Plaintiff.**

No. 49A04–9410–CV–397.

Court of Appeals of Indiana.

Jan. 12, 1996.

Rehearing Denied March 15, 1996.

---

Frank W. Hogan, Symmes, Voyles, Zahn, Paul & Hogan, Indianapolis, Stephen M. Komie, Komie and Associates, Chicago, for Appellant.

John F. Prescott, Jr., Ice Miller Donadio & Ryan, Indianapolis, for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

D.A.X., Inc. appeals the trial court's judgment in favor of Employers Insurance of Wausau. We affirm.

### ISSUES

I. Whether Wausau unconstitutionally impaired D.A.X.'s contractual obligations.

II. Whether the trial court reformed the contract between D.A.X. and Wausau.

III. Whether the trial court erred in concluding that because D.A.X. failed to pursue a mandatory administrative remedy, D.A.X. is estopped to contest the use of the Illinois Rate.

### FACTS

Employers Insurance of Wausau is an insurance company which is authorized to issue worker's compensation insurance in Indiana. D.A.X., Inc. was an employee leasing company incorporated in Illinois with an office in Hammond, Indiana. D.A.X.'s employees, primarily truck drivers, were leased solely to High Noon Express, an Illinois trucking company with Interstate Commerce Commission interstate trucking authority. Both D.A.X. and High Noon Express were owned by the Autullo family.

The Indiana Compensation Rating Bureau is a statutorily created governmental agency which regulates worker's compensation insurance in Indiana.[1] *See* Ind.Code 27–7–2 *et seq.* An employer whose application for worker's compensation insurance has been rejected by three insurance companies in the open market can apply to the Bureau for assigned risk worker's compensation insurance. Ind.Code 27–7–2–28. The Bureau reviews the application to determine whether the risk should be assigned to a member of the Bureau. If the Bureau assigns the risk to one of its members, the insurer has a statutory duty to issue a policy to the applicant.[2] Ind.Code 27–7–2–29(b).

On December 6, 1988, D.A.X., through its independent insurance agent, Russell Cawthon, applied for assigned risk worker's compensation insurance through the Bureau. The assigned risk application required D.A.X. to make a good faith estimate of the total payroll that it expected for the year. Based on that estimate, D.A.X. was to make a good faith estimate of its worker's compensation insurance annual premium. D.A.X. estimated its total annual payroll at $185,000.00 and its worker's compensation premium at $7,277.00. D.A.X.'s application further stated that there were no "operations in States other than Indiana." (R. 665).

The Bureau reviewed D.A.X.'s application, determined that it appeared facially acceptable, and assigned D.A.X. to Wausau.[3] Pursuant to the Bureau's direction, Wausau issued D.A.X. a worker's compensation policy which provided coverage from December 7, 1988 to December 7, 1989. The policy issued

---

1. Every insurance company authorized to issue worker's compensation insurance in Indiana, including Wausau, is a member of the Bureau.

2. Assigned Risk policies are equitably apportioned among the insurance companies which comprise the Bureau. Ind.Code 27–7–2–28.1(a). Further, Bureau insurers are "reinsurers as among themselves...." Ind.Code 27–7–2–29(b).

Accordingly, the costs of operating the plan, including any losses, are equitably shared by Bureau members.

3. Because the Bureau had no prior experience with D.A.X., the Bureau had no way to determine the accuracy of the information in the application.

to D.A.X. provided in pertinent part as follows:

## PART FIVE—PREMIUM

A. Our Manuals

All premium[s] for this policy will be determined by our manuals of rules, rates, rating plans and classifications. We may change our manuals and apply the changes to this policy if authorized by law or a governmental agency regulating this insurance.

B. Classifications

Item 4 of the Information Page shows the rate and premium basis for certain business or work classifications. These classifications were assigned based on an estimate of the exposures you would have during the policy period. If your actual exposures are not properly described by those classifications, we will assign proper classifications, rates and premium basis by endorsement of the policy....

E. Final Premium

The premium shown on the Information Page ... is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance....

F. Records

You will keep records of information needed to compute the premium. You will provide us with copies of those records when we ask for them.

G. Audit

You will let us examine and audit all your records that relate to this policy. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data. We may conduct the audit during the regular policy period and within three years after

the policy period ends. Information developed by audit will be used to determine the final premium....

(R. 624).

In January 1989, the National Council of Compensation Insurance (NCCI)[4] promulgated an Extra–Territorial Auditing Procedure. This procedure, which the Bureau adopted, was included in a manual which the Bureau distributed to its members. The Bureau expected that its members, including Wausau, would use and apply this procedure, which provided as follows:

## EXTRA–TERRITORIAL AUDITING PROCEDURE

B. Truckers

The payroll of drivers, chauffeurs and helpers for truckers shall be assigned to the state in which the base terminal from which they load, unload store or transfer freight on a regular basis is located.

EXAMPLE: A trucker resides in State A. His base terminal is in State B. If the driver travels regularly to the base terminal in State B to load or unload freight, the trucker's payroll shall be assigned to State B.

When the driver, chauffeur or helper does not operate from a "base terminal" a determination shall be made as to where the exposure lies. In that case, Payroll shall be assigned as follows:

1. If it can be established that a trucker spends a majority of driving time in a specific state, the trucker's payroll shall be assigned to that state.

2. If base terminal or state of majority driving time cannot be established and a trucker is traveling from his state of residence, payroll shall be assigned to state of residence.

For purposes of these procedures the following definitions shall apply:

Base Terminal: A permanent location with central loading docks and/or storage facili-

---

**4.** The NCCI is a national organization which gathers statistical data and helps promulgate worker's compensation rates.

ties where a trucker regularly goes to load, unload, store or transfer freight.

State of Residence: The state in which the trucker resides as evidenced by the location used for the filing of federal income taxes.

Regular: A pattern of 40 hours per week or any other pattern that appears on a continuing basis.

(R. 677).

In November 1989, Wausau requested that the Bureau "inspect" D.A.X.'s account because worker's compensation claims were being turned in under the name High Noon Express in Illinois. On January 2, 1990, NCCI employee Humphrey Hampton inspected D.A.X.'s facility in Hammond.[5] Following Hampton's inspection, the Bureau sent the following letter, dated March 14, 1990, to Wausau:

> The insured's facility at 3626 Calumet Avenue, Hammond, Indiana does not qualify as a base terminal. Additionally, there is no single state which qualifies as a state of majority driving time. As such, the drivers payroll is to be assigned to the drivers state of residence. Only the insureds clerical persons, corporate officers and Indiana resident drivers are eligible for Indiana rates. All other drivers are to be assigned to their state of residence.

(R. 836).

Meanwhile, in January 1990, following the December 7, 1989 expiration of D.A.X.'s insurance policy, Wausau Senior Field Auditor David DelVecchio was assigned to conduct D.A.X.'s final premium audit.[6] DelVecchio testified that a final audit is generally completed within 90 days of the policy's expiration. In mid-January, DelVecchio contacted D.A.X. and explained that he needed to schedule a worker's compensation audit with someone who had access to and control over payroll records. DelVecchio left his name and telephone number and waited for a return phone call. DelVecchio never received a phone call, and in February 1990, he mailed

D.A.X. an appointment card stating that he was planning to conduct the audit on March 1, 1990. On March 27, DelVecchio sent D.A.X. another letter re-scheduling the audit for April 4, 1990.

On April 4, DelVecchio went to D.A.X.'s Calumet Avenue address where he met with Rex Plattner and Russell Cawthon. According to DelVecchio, D.A.X.'s office, consisted of a leased space at a truck stop on a toll road, and contained one desk and three to four chairs. D.A.X. employees did not load, unload, store or transfer freight at this location. DelVecchio and Plattner discussed the Bureau's March 14 letter to Wausau. They further discussed Plattner providing DelVecchio with W-2 and 1099 records so DelVecchio could determine the employees' states of residence if he could not determine the states of majority driving time. During the audit, Plattner gave DelVecchio four quarterly state unemployment reports for the 1989 calendar year. However, these reports did not contain sufficient information to permit DelVecchio to determine the employees' states of residence for purposes of assigning a payroll to a particular state. DelVecchio specifically requested W-2 and 1099 forms, as well as any other records which would show in which states the employee miles were driven. Plattner told DelVecchio that this information was at D.A.X.'s accounting firm, but that he would make copies and mail them to DelVecchio at a later date. According to DelVecchio, the W-2 forms would have permitted him to determine the employees' states of residence.

On April 10, 1990, DelVecchio sent a letter to Plattner requesting D.A.X. to submit the requested documentation and information needed to complete the audit. On April 20, DelVecchio sent Plattner another letter indicating that since D.A.X. had failed to cooperate in helping him to conduct a proper audit that he would have to submit the audit with the limited information that he had received.

---

**5.** Bureau Board Member Margaret Kepner testified that when an insurance company requests an inspection of an insured, it is customary to contact the NCCI and have someone like Hampton make an inspection.

**6.** According to DelVecchio, he has completed more than 1,000 audits, including 50 to 100 trucking company audits.

On May 4, 1990, Wausau sent D.A.X. an audit premium adjustment invoice requesting payment of an additional $186,110.00.[7] D.A.X. did not pay the additional premium, and on November 14, 1991, Wausau filed a complaint against D.A.X. seeking judgment in the "principal amount of $186,110.00 ... plus pre-judgment interest as provided by law." (R. 14). Wausau also sought post-judgment interest on the total judgment amount.

The trial court conducted a three day bench trial in April, 1994, and issued 30 pages of findings of fact and conclusions of law in June 1994. Further, the trial court ordered D.A.X. to pay Wausau the "principal sum of One Hundred Eighty–Six Thousand One Hundred Ten Dollars ($186,110.00) plus pre-judgment interest in the aggregate amount of $61,023.68 for a total judgment amount of $247,133.68." (R. 472). In addition, the trial court ordered post-judgment interest to run on the total judgment amount until the judgment was satisfied. D.A.X. appeals the trial court's judgment.

## DECISION

### Standard of Review

■ D.A.X. orally requested special findings of fact and conclusions of law; however, D.A.X. did not submit a written request to the trial court before submission of evidence. Ind.Trial Rule 52(A) requires a written request, and we have previously determined that an oral request for findings does not invoke the trial rule. *Wesner v. Metropolitan Development Commission* (1992), Ind.App., 609 N.E.2d 1135, 1137. The T.R. 52(A) standard of review is therefore inapplicable. *See, Bratton v. Yerga* (1992), Ind. App., 588 N.E.2d 550, 554. Rather, the general judgment controls as to the issues upon which the trial court has not found, and the specific findings control only as to the issues they do cover. *Id.* While the specific find-

ings will not be set aside unless they are clearly erroneous, we will nonetheless affirm the general judgment upon any legal theory supported by the evidence introduced at trial. *Id.* Further, this court neither reweighs the evidence nor judges the credibility of witnesses. *Perdue Farms, Inc. v. Pryor* (1995), Ind.App., 646 N.E.2d 715, 717, *reh'g denied.* We view only the evidence most favorable to the judgment. *Id.*

### I. *Impairment of Contract*

■ D.A.X. first argues that the trial court's judgment "upheld the unconstitutional impairment of [D.A.X.'s] obligations of contract." D.A.X.'s Brief, p. 20. Specifically, D.A.X. argues that "[b]y attempting to retroactively apply the Illinois rate under the assigned risk law, [Wausau] as ICRB's statutory agent is clearly impairing [D.A.X.'s] obligation under this insurance contract." D.A.X.'s Brief, p. 24–25. According to D.A.X., the "ICRB has ... empowered the plaintiff to change the premium rate from Indiana to Illinois in the subject insurance policy." D.A.X.'s Brief, p. 26. Wausau responds that "D.A.X.'s argument is ... fundamentally flawed because [D.A.X.] never had a contractual right ... to pay premiums based solely on Indiana's rates." Wausau's Brief, p. 27. We agree with Wausau.

■ Both the United States and Indiana constitutions prohibit the impairment of obligations of contracts. U.S. Const. art. 1, § 10; Ind. Const. art. I, § 24. The threshold inquiry in determining whether there has been an unconstitutional impairment of a contractual obligation is "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Energy Reserves Group, Inc. v. Kansas Power and Light Co.* (1983), 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569. In *Corn v. City of Oakland City* (1981), Ind.App., 415

---

7. This premium was based on an Illinois rate and D.A.X.'s total annual payroll. At trial, DelVecchio summarized why he assigned all of D.A.X.'s payroll to Illinois. According to DelVecchio, Wausau had had claims filed in Illinois by drivers alleging that they resided in Illinois and drove for an Illinois trucking company by the name of High Noon Express. DelVecchio fur-

ther testified that the first quarter state unemployment return indicated that a significant percentage of D.A.X. employees lived in Illinois. Lastly, DelVecchio testified that he had been prepared to revise the audit if D.A.X. had provided him with the requested records. Further, we note that D.A.X.'s quarterly payroll was $210,-915.83.

N.E.2d 129, Corn argued that the actions of the city in enacting an ordinance which abolished the office of city judge impaired the contractual obligations between the city and Corn in violation of both federal and state constitutions. We disagreed and found that because Corn had no contractual right to his office, no contractual obligation was unconstitutionally impaired by the abolition of his office. *Id.* at 133.

Here, there was no substantial impairment of D.A.X. and Wausau's contractual relationship because, as Wausau points out, "D.A.X. never had a [contractual] right to pay premiums based solely on Indiana rates." Wausau's Brief, p. 27. Rather, the contract clearly states that:

> The final premium will be determined after this policy ends by using the actual, not the estimated premium basis and the proper classifications and *rates that lawfully apply to the business* and work covered by this policy.

(R. 624). (Emphasis added). Auditor David DelVecchio determined that Illinois rates lawfully applied to D.A.X.

Further, the contract imposed a duty on D.A.X. to "keep records of information needed to compute the premium." (R. 624). According to the contract, "these records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data." (R. 624). In addition, the contract imposed a duty on D.A.X. to provide Wausau "with copies of those records when we ask for them." (R. 624). D.A.X. did not provide Wausau with the requested records, and DelVecchio billed D.A.X. using the Illinois rates based on "what little [he had] actually seen." (R. 1140). At trial, DelVecchio testified that he had been prepared to revise the audit if D.A.X. had provided him with the requested records. We find no unconstitutional impairment of D.A.X.'s contractual obligations.

## II. *Contract Reformation*

■ D.A.X. argues that the trial court erred in reforming the contract between Wausau and D.A.X. Specifically, D.A.X. argues that "[t]o change the policy from an Indiana Rate to that of an Illinois Rate would work a fundamental change in this policy from D.A.X.'s position, and should not be permitted particularly after the policy year had expired." D.A.X.'s Brief, p. 48. Wausau responds that the trial court did not reform the contract. Rather, according to Wausau:

> [T]he trial court simply enforced the contract the way in which it was written; namely, to permit Wausau to determine proper classifications, rates and premium based on Final Audit. That is not reformation.

Wausau's Brief, p. 45. Again, we agree with Wausau.

■ We have previously quoted Black's Law Dictionary which defines "reform" as follows:

> To correct, rectify, amend, remodel. Instruments *inter partes* may be *reformed,* when defective, by a court of equity. By this is meant that the court, after ascertaining the real and original intention of the parties to a deed or other instrument, (which intention they failed to sufficiently express, through some error, mistake of fact or inadvertence,) will decree that the instrument be held and construed as if it fully and technically expressed that intention. *Churchill v. Mead [Meade],* 92 Or. 626, 182 P. 368, 371; *Gross v. Yeskel,* 100 N.J.EQ. 293, 134 A. 737.

*Sharp v. Jones* (1986), Ind.App., 497 N.E.2d 593, 596 (quoting Black's Law Dictionary 1446, Rev. 4th Ed. (1968)) Reformation of a contract is appropriate when both parties mistakenly execute a document which does not express the true terms of their agreement, or when one party so executes but the other acts fraudulently or inequitably with knowledge of the other's mistake. *Id.* Further, a mistake by the scrivener will permit reformation of the contract where it is apparent that both parties were mistaken as to the actual contents of the instrument. *Sharp, supra,* at 596.

Here, the contract provided that Wausau would determine the final premium after the policy had ended by using the proper classifications and rates. Further, according to the contract, Wausau would conduct an audit to

gather information to determine the proper classifications and rates. DelVecchio audited D.A.X., and based on both information obtained during the audit and D.A.X.'s failure to provide additional requested information, DelVecchio assigned Illinois rates. The trial court concluded as follows on this issue:

> [T]he policy clearly provides that 'The Final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy.' Thus, to the extent Wausau's manuals of rules provide that payroll should be assigned to a state other than Indiana, then the policy clearly provides that the Final Premium will be computed by using the rates and classifications from such other states as may lawfully apply.

(R. 460). Clearly, as in *Sharp*, the trial court was enforcing the contract as written, not reforming it.

III. *Administrative Remedy*

 D.A.X. further argues that the "trial court committed error of law in holding that [D.A.X.] failed to pursue a mandatory administrative remedy and thus is estopped to question in this action the changing of the driver payroll from Indiana to Illinois workers compensation rates." D.A.X.'s Brief, p. 27. Specifically, D.A.X. argues as follows:

> The trial court in its judgment has held that under I.C. 27–7–2–20.3(c)(2) [D.A.X.] is an 'aggrieved person,' and, that it had a mandatory remedy under the statute to seek administrative review of ICRB's and [Wausau's] claim that the Illinois workers compensation premium rate applies to [D.A.X.'s] drivers. The court, however, has erroneously read and applied this statute to the present facts.

D.A.X.'s Brief, p. 27–28. We disagree.

Ind.Code 27–7–2–20.3(c)(2) provides as follows:

> Every company or the bureau shall provide within Indiana reasonable means whereby any person aggrieved by the application of its filings may be heard on written request to review the manner in which such rating system has been applied

in connection with the insurance afforded or offered. If the company or the bureau fails to grant or reject such request within thirty (30) days, the aggrieved person may proceed in the same manner as if the request had been rejected. Any aggrieved person affected by the action of such company or the bureau on such request may, within thirty (30) days after written notice of such action, appeal to the commissioner who, after a hearing upon not less than ten (10) days written notice to the aggrieved person and to such company or the bureau, may affirm, modify, or reverse such action.

 We first observe that, pursuant to Ind.Trial Rule 36, D.A.X. admitted: 1) that it was an "aggrieved person within the meaning of I.C. 27–7–2–20.3(c)(2)," and 2) that it had "never made a written request to the Indiana Compensation Rating Bureau or its dispute resolution committee to review the manner in which [Wausau] applied its rates and/or rating system in connection with the insurance ... in this case." (R. 1336–37). Further, I.C. 27–7–2–20.3(c)(2) is an administrative remedy which an insured must exhaust before challenging non-Indiana rates in court. *See, Celadon Trucking Services of Ind., Inc. v. Liberty Mutual Insurance Company* (1991), S.D.Ind., IP 89–167–C.

In *Celadon*, trucking company Celadon's assigned risk worker's compensation insurance carrier was Liberty Mutual. Celadon claimed that Liberty Mutual had charged it excessive, non-approved, non-Indiana rates. Without challenging, appealing, or bringing the non-approved rates to the attention of the ICRB, Celadon filed suit against Liberty Mutual in federal court seeking reimbursement of the overcharged rates. Liberty Mutual filed a motion to dismiss Celadon's claim based on Celadon's failure to exhaust its administrative remedies. According to Liberty Mutual, I.C. 27–7–2–20.3(c)(2) provided the authority and framework for contesting rates assessed under the assigned risk plan. Judge Sarah Evans Barker agreed with Liberty Mutual and stated as follows:

> [I]n light of the character of the questions presented in Celadon's complaint—such as whether Liberty Mutual failed to comply with the ICRB guidelines and what rate

should have been applied to Celadon's drivers (to determine what, if any, are the damages)—and the authority Indiana has given to the ICRB to resolve this type of dispute, ... exhaustion of this administrative remedy is imperative.

*Id.* at 6.

As in *Celadon,* trucking company D.A.X. did not request the ICRB or its dispute resolution committee to review the manner in which Wausau applied non-Indiana rates. The trial court concluded as follows:

41. The Court concludes that D.A.X. had an available administrative remedy which it failed to exhaust. If D.A.X. wished to challenge the Bureau's factual finding that it did not have a base terminal, the Bureau's interpretation of the Extra–Territorial Auditing Procedure that shipper locations cannot constitute a base terminal, and/or the Bureau's direction to Wausau that it should proceed to determine the state to which trucker payroll should be assigned based upon the truckers' states of residence, or any of Wausau's conduct with regard to the manner in which it computed the Final Premium in reliance on the Bureau's findings, interpretation and directions, D.A.X. should have and was required to pursue its administrative remedy.

42. D.A.X. is estopped to deny that the administrative remedy provided by I.C. 27–7–2–20.3(c)(2) is a mandatory remedy requiring exhaustion by an aggrieved person.

43. Because D.A.X. failed to exhaust its available administrative remedy, D.A.X. is estopped from challenging in this court Wausau's assignment of D.A.X.'s payroll to the State of Illinois.

(R. 469–70).

The trial court did not erroneously read and apply I.C. 27–7–2–20.3(c)(2) to the facts before it.[8] Accordingly, the trial court did not err in concluding that because D.A.X. failed to pursue a mandatory administrative remedy, D.A.X. was estopped to contest the use of the Illinois rate.[9]

Affirmed.

CHEZEM and RILEY, JJ., concur.

---

**8.** In its reply brief, D.A.X. responds as follows:
Judging from its Brief, it does not appear that plaintiff actually read defendant's argument II. Had it done so, again, it would understand that under I.C. 27–7–2–20.3 it is "filings" with the ICRB on proposed rates that may generate a grievance on behalf of one affected by the *filing*. Here, there was no such filing, which the record shows.
D.A.X.'s Reply Brief, p. 12. In *Celadon,* Judge Barker responded to this argument as follows:
This court finds unpersuasive Celadon's argument that IND.CODE § 27–7–2–20.3 applies only to grievances about rates which have been "filed."
*Celadon,* at 6.

**9.** D.A.X. further argues as follows:

1) The trial court erred by relying solely on the January 1989 Extra–Territorial Auditing Procedure to determine whether D.A.X. had an Indiana base terminal and in changing D.A.X.'s driver payroll from Indiana to Illinois. 2) The trial court erred in holding that the Bureau approved changing D.A.X.'s driver payroll premium rate retroactively to December 7, 1988. 3) The trial court erred in relying on evidence of claims paid as a basis to assign D.A.X.'s payroll to Illinois.
We decline D.A.X.'s invitations to reweigh the evidence. *See, Perdue Farms, supra.*